PETER LANDER, JR. v. A. B. SEAVER.

*Authority of school teachers to punish their scholars.    Evidence.*

Though a schoolmaster has in general no right to punish a pupil for misconduct committed after the dismissal of school for the day, and the return of the pupil to his home, yet he may, on the pupil's return to school, punish him for any misbehavior, though committed out of school, which has a direct and immediate tendency to injure the school and to subvert the master's authority.

A schoolmaster is not relieved from liability in damages for the punishment of a scholar which is *clearly* excessive and unnecessary, by the fact that he acted in good faith and without malice, honestly thinking that the punishment was necessary both for the discipline of the school and the welfare of the scholar.

But if there is any reasonable doubt that the punishment was excessive, the master should have the benefit of it.

Upon the question whether the punishment of a pupil by his master was excessive or not, evidence that the ordinary management of the latter as a teacher was mild and moderate is not admissible.

It *seems*, however, that such evidence would be admissible in regard to the question whether the punishment was wanton and malicious.

Whether a rawhide is a proper instrument of punishment of a pupil by his master is for the jury to decide, in consideration of all the circumstances of the case.

Upon the question whether a school teacher acted maliciously in the punishment of a scholar, it is competent for the former to show that in other schools in the vicinity the same instrument of punishment is used as that resorted to by him.

In trespass against a schoolmaster for the punishment of a scholar on account of misconduct out of school, it was held that it was competent evidence

against the charge that the punishment was excessive, to show that at a former trial of the same case, no claim of that kind was made, but that the plaintiff then only claimed that the master had no right to punish for such misconduct.

TRESPASS for assault and battery. Plea the general issue and two special pleas in bar. The first special plea alleged that the defendant was a schoolmaster, and the plaintiff was one of his pupils, and was guilty of misbehavior as such pupil, for the purpose of punishing which the defendant did, in his school, a little beat and bruise the plaintiff, doing him no unnecessary injury, which was alleged to be the same trespass complained of in the declaration.

The second special plea justified the alleged trespass upon the same ground, except that the offence for which the plaintiff was alleged to have been punished, was stated to have been the use of saucy and disrespectful language towards the defendant, after the close of the school, but in the presence of other pupils of the defendant, such language tending to degrade the latter in the opinion of such other pupils.

The plaintiff replied *de injuria*, &c., and the case was tried by jury at the September Term, 1858, in Chittenden county, BENNETT, J., presiding.

From the testimony it appeared that the defendant was the teacher of a district school in Burlington, and that the plaintiff, whose age was about eleven years, was one of his pupils; that one day, about an hour and a half after the close of school in the afternoon, and after the plaintiff had returned home from school, and while he was driving his father's cow by the defendant's house, in presence of the defendant and of some of his fellow pupils, the plaintiff called the defendant *Old Jack Seaver;* that the next morning, after school had commenced, the plaintiff having come to school as usual, the defendant, after reprimanding the plaintiff for his insulting language the evening before, whipped him with a small rawhide. The testimony on the part of the plaintiff tended to show that this whipping was severe and excessive, while that of the defendant tended to prove the contrary.

On trial the defendant offered to prove that up to the time of the alleged trespass his ordinary management of his school had

always been mild and moderate. To the admission of such evidence the plaintiff objected, but the court held it admissible, and testimony was introduced tending to prove such to be the fact. To the admission of this testimony the plaintiff excepted.

The defendant also offered testimony tending to prove that at a former trial of this case before a justice of the peace, neither the plaintiff, nor his father, nor his counsel claimed that the punishment of the plaintiff was excessive, but that the only claim then was that the defendant had no right to punish the boy for acts done out of and away from the school. The plaintiff objected to the admission of this testimony, but the court admitted it, to which the plaintiff excepted.

The defendant also proposed to show that it was the usage and custom of the teachers in other schools in Burlington to use rawhide whips in the punishment of their scholars. The plaintiff objected to such testimony, but the court admitted it, to which the plaintiff excepted.

The court charged the jury among other things, that if the plaintiff, while passing the defendant in the presence of other pupils of the same school, used toward him and in his hearing contemptuous language, with a design to insult him, and the tendency of this conduct, if unpunished, would be to bring the authority of the master over his pupils into contempt, and lessen his hold upon them and his control over the school as their teacher, the defendant had the right, upon the lad's return to the school the next day, to punish him for such misconduct, although it occurred after the school had been dismissed for the day, and after the boy had returned home and while he was driving his father's cow from the pasture by the house of the defendant, and that the jury would judge of the import of the language used, the design with which it was used, and its tendency.

The jury were also told, that it was both reasonable and proper that the scholar should be made to understand for what he was about to be punished; and that if in this case the plaintiff understood at the time what he was punished for, this was enough without any formal communication from the master.

In regard to the instrument used by the master in making the correction, the court declined to tell the jury that the use of it,

as matter of law, rendered the defendant liable in this action, but instructed them that this question was for them to decide, and that they should take into consideration the instrument used in making the correction, as having a bearing on the character of the punishment, and the motives which may have influenced the the master in inflicting it ; that if the instrument was an improper one, the bearing would be against the master ; but if otherwise, in his favor ; and the court, after referring to the testimony in relation to the instrument, submitted it to the jury as a question of fact for them to determine in regard to the suitableness or the unsuitableness of the instrument used by the defendant.

Upon the question whether the defendant should be held liable for an excess in punishment inflicted upon the plaintiff, and for the purpose of illustrating to the jury the principles that should govern in actions of this kind, the court, as part of their charge, read to the jury from page 287 of Reeve's Domestic Relations, relative to the rights and duties of parent and child, the following paragraph :

" The parent has a right to govern his minor child, and as incident to this, he must have power to correct him. The maxim is, that he has power to chastise him moderately. The exercise of this power must be, in a great measure, discretionary. He may so chastise his child as to be liable in an action against him by the child for a battery. The child has rights which the law will protect against the brutality of a barbarous parent. I apprehend, however, it is a point of some difficulty to determine with exact precision when a parent has exceeded the bounds of moderation. That correction which will be considered by some triers as unreasonable will be viewed by others as perfectly reasonable. What may be considered by some a venial folly to which none or very little correction ought to be applied, by others will be considered an offence that requires very severe treatment. The parent is bound to correct a child, so as to prevent him from becoming the victim of vicious habits, and thereby proving a nuisance to the community.

The true ground on which this ought to be placed, I apprehend, is that the parent ought to be considered as acting in a judicial capacity when he corrects, and of course not liable for errors of

opinion. And although the punishment should appear to the triers to be unreasonably severe, and in no measure proportioned to the offence, yet if it should also appear that the parent acted conscientiously and from motives of duty, no verdict ought to be found against him. But when the punishment is, in their opinion, thus unreasonable, and it appears that the parent acted *malo animo*, from wicked motives, under the influence of an unsocial heart, he ought to be liable to damages. For error of opinion he ought to be excused, but for malice of heart he must not be shielded from the just claims of the child. Whether there was malice, may be collected from the circumstances attending the punishment. The instrument used, the time when, the place where, the temper of the heart exhibited at the time, may all unite in demonstrating what the motives were which influenced the parent. These observations are equally applicable to the case of a schoolmaster or to any one who acts *in loco parentis.*"

The court also read to the jury the following paragraphs from the same work, on pages 374 and 375 :

" The master has the right to give moderate corporeal punishment to his servant for disobedience to his lawful commands, negligence in his business, or for insolent behavior."

" This right of correction is personal, and cannot be delegated to any one. A schoolmaster, in his own right, and not by delegation, possesses this power. A master cannot justify a wounding of the servant. This term, as used in our books, must, I think, be such a wounding as furnishes evidence that the master acted *malo animo*, which will subject him to damages ; for some wounding, according to the common acceptation of the word, might arise from very reasonable correction ; and although in pleading, it will be difficult to spread upon record the nature of the wounding, the master, if sued, must plead not guilty. Yet I apprehend the jury are not warranted to find him guilty of any the least wounding, providing they found the correction to have been given with the right temper of heart. It must be so disproportioned to the offense as to furnish evidence of the *malus animus.*"

The court told the jury that the authority of a schoolmaster over his pupils was nearly related to that of a parent over his child, and that its exercise rested in a measure in discretion, and

that in a certain sense the schoolmaster acts in a judicial capacity in administering correction to one of his pupils for misconduct, and he should not be made liable for what should be regarded as simply an error in opinion, if it appears he acted with proper motives and in good faith, and in his judgment for the best interests of the school, and that if the jury were satisfied from the evidence that the defendant so acted in the correction of the plaintiff, he should not be found guilty of an excess of severity in the punishment of the plaintiff, though the jury might think that the punishment was too severe, and that he went beyond what the offence of the plaintiff deserved, and beyond what they would have gone in a similar case ; that this rule was necessary, and that if a schoolmaster was to be made liable for every error in judgment, in the opinion of a jury, when he acted with good intentions, it would be quite difficult to find a schoolmaster who would assume the authority of correction, without which a school could not well be carried on.

But the court told the jury that if they believed from the testimony that the defendant acted from wicked motives and for the purpose of gratifying his spleen or ill will towards the plaintiff, and the punishment was unreasonably severe, he should be held liable for damages in this action, and that in determining the motives which governed the defendant in giving the correction, they should take into consideration the character of the instrument made use of, as well as the temper of mind exhibited, and all the circumstances and facts bearing upon the event, and on this point it was proper that they should consider the evidence which had been given in relation to similar instruments of correction being kept and used in other schools in Burlington prior to that time.

To the charge of the court, as above detailed, the plaintiff excepted.

The jury rendered a verdict for the defendant.

*Roberts & Chittenden*, for the plaintiff.

*Geo. F. Edmunds*, for the defendant.

ALDIS, J.   The defendant was a teacher in a public school in Burlington, the plaintiff his pupil.   The first question presented

is, has a schoolmaster the right to punish his pupil for acts of misbehavior committed after the school has been dismissed, and the pupil has returned home and is engaged in his father's service?

It is conceded that his right to punish extends to school hours, and there seems to be no reasonable doubt that the supervision and control of the master over the scholar extend from the time he leaves home to go to school till he returns home from school. Most parents would expect and desire that teachers should take care that their children, in going to and returning from school, should not loiter, or seek evil company, or frequent vicious places of resort. But in this case, as appears from the bill of exceptions, the offence was committed an hour and a half after the school was dismissed, and after the boy had returned home and while he was engaged in his father's service. When the child has returned home or to his parent's control, then the parental authority is resumed and the control of the teacher ceases, and then for all ordinary acts of misbehavior the parent alone has the power to punish. It is claimed, however, that in this case " the boy, while in the presence of other pupils of the same school, used, toward the master and in his hearing, contemptuous language, with a design to insult him, and which had a direct and immediate tendency to bring the authority of the master over his pupils into contempt and lessen his hold upon them and his control over the school." This, under the charge of the court, must have been found by the jury.

This misbehavior, it is especially to be observed, has a direct and immediate tendency to injure the school, to subvert the master's authority, and to beget disorder and insubordination. It is not misbehavior generally, or towards other persons, or even towards the master in matters in no ways connected with or affecting the school. For, as to such misconduct committed by the child after his return home from school, we think the parents, and they alone, have the power of punishment.

But where the offence has a direct and immediate tendency to injure the school and bring the master's authority into contempt, as in this case, when done in the presence of other scholars and of the master, and with a design to insult him, we think he has the right to punish the scholar for such acts if he comes again to school.

The misbehavior must not have merely a remote and indirect tendency to injure the school. All improper conduct or language may perhaps have, by influence and example, a remote tendency of that kind. But the tendency of the acts so done out of the teacher's supervision for which he may punish, must be direct and immediate in their bearing upon the welfare of the school, or the authority of the master and the respect due to him. Cases may readily be supposed which lie very near the line, and it will often be difficult to distinguish 'between the acts which have such an immediate and those which have such a remote tendency. Hence each case must be determined by its peculiar circumstances.

Acts done to deface or injure the schoolroom, to destroy the books of scholars, or the books or apparatus for instruction, or the instruments of punishment of the master; language used to other scholars to stir up disorder and insubordination, or to heap odium and disgrace upon the master; writings and pictures placed so as to suggest evil and corrupt language, images and thoughts to the youth who must frequent the school; all such or similar acts tend directly to impair the usefulness of the school, the welfare of the scholars and the authority of the master. By common consent and by the universal custom in our New England schools, the master has always been deemed to have the right to punish such offences. Such power is essential to the preservation of order, decency, decorum and good government in schools. Upon this point the charge of the court was substantially correct.

II. The court charged the jury that although the punishment inflicted on the plaintiff was excessive in severity and disproportioned to the offence, still if the master in administering it acted with proper motives, in good faith, and, in his judgment, for the best interests of the school, he would not be liable; that the schoolmaster acts in a judicial capacity, and that the infliction of excessive punishment, when prompted by good intentions and not by malice or wicked motives, or an evil mind, is merely an honest error of opinion, and does not make him liable to the pupil for damages. The plaintiff claims that this was erroneous.

1. It is claimed on behalf of the defendant that the schoolmaster is a public officer, that in his government of the school he is invested with public authority, with discretionary powers, and

acts in a judicial capacity, and so is not liable for errors of judg-
ment. His authority has been likened to that of public officers,
such as listers in the case of *Fuller* v. *Gould*, 20 Vt. 643, the
postmaster general in *Kendall* v. *Stokes*, 3 Howard 87, the mayor
of New York in *Wilson* v. *The Mayor*, &c., 1 Denio 595, or a
commander in the navy, as in *Wilkes* v. *Dinsman*, 7 Howard 89.

We think the schoolmaster does not belong to the class of pub-
lic officers vested with such judicial and discretionary powers.
He is included rather in the domestic relation of master and ser-
vant, and his powers and duties are usually treated of as belong-
ing to that class. In some sense he may be said to act by public
authority and to be a public officer, but we do not find him
spoken of any where as acting in a judicial capacity, except in
the passage from Reeve's Domestic Relations, which was read to
the jury. In no proper sense can he be deemed a public officer
exercising, by virtue of his office, discretionary and *quasi judicial*
powers.

2. It is also said that he stands *in loco parentis*, and is invested
with *all* the authority and immunity of the parent. Such would
seem to be the doctrine of the passage cited from Judge Reeve's
work.

The parent, unquestionably, is answerable only for malice or
wicked motives or an evil heart in punishing his child. This
great and to some extent irresponsible power of control and cor-
rection is invested in the parent by nature and necessity. It
springs from the natural relation of parent and child. It is felt
rather as a duty than a power. From the intimacy and nature
of the relation, and the necessary character of family government,
the law suffers no intrusion upon the authority of the parent, and
the privacy of domestic life, unless in extreme cases of cruelty
and injustice. This parental power is little liable to abuse, for it
is continually restrained by natural affection, the tenderness which
the parent feels for his offspring, an affection ever on the alert,
and acting rather by instinct than reasoning.

The schoolmaster has no such natural restraint. Hence he
may not safely be trusted with all a parent's authority, for he does
not act from the instinct of parental affection. He should be
guided and restrained by judgment and wise discretion, and hence

is responsible for their reasonable exercise. The limit upon the parental authority transferred to the master is well expressed by Judge BLACKSTONE. He says :

" The master is *in loco parentis*, and has such a *portion* of the powers of the parent committed to his charge, as may be neces- sary to answer the purposes for which he is employed." An English annotator, in a note to the passage, very properly adds, "this power must be temperately exercised, and no schoolmaster should feel himself at liberty to administer chastisement coexten- sive with the parent."

Judge SWIFT, in his digest, in a very admirable summary of the powers and duties of the schoolmaster, remarks that if the punishment is immoderate, so that the child sustains a material injury, the master is liable in damages. In a recent case in Mass., *Commonwealth* v. *Randall*, 4 Gray 36, the defendant asked the Judge to instruct the jury that the schoolmaster is liable only when he acts *malo animo*, from vindictive feelings, or under the violent impulses of passion or malevolence, and that he is not lia- ble for errors of opinion or mistakes of judgment, provided he is governed by an honest purpose of heart, to promote by the disci- pline employed, the highest welfare of the school and the best interest of the scholar." In the case at bar the court charged substantially according to that request, but in the case reported in Gray the court refused so to charge, and did charge that if the jury found that the punishment was excessive and improper then the master might properly be found guilty.

The charge was held to be correct upon the hearing of the defendant's exceptions in the supreme court. In the case of *Hathaway* v. *Rice*, 19 Vt. 102, we think the principle involved in the decision establishes the same doctrine.

Suits of this character have frequently arisen in this State, and the rulings of our courts at *nisi prius* have, we think, been quite uniform on this point. The law, as we deem it to exist, is this :—A schoolmaster has the right to inflict reasonable corpo- real punishment. He must exercise reasonable judgment and discretion in determining when to punish and to what extent. In determining upon what is a reasonable punishment, various considerations must be regarded, the nature of the offence, the

apparent motive and disposition of the offender, the influence of his example and conduct upon others, and the sex, age, size and strength of the pupil to be punished. Among reasonable persons much difference prevails as to the circumstances which will justify the infliction of punishment, and the extent to which it may properly be administered. On account of this difference of opinion, and the difficulty which exists in determining what is a reasonable punishment, and the advantage which the master has by being on the spot to know all the circumstances, the manner, look, tone, gestures and language of the offender, (which are not always easily described,) and thus to form a correct opinion as to the necessity and extent of the punishment, considerable allowance should be made to the teacher by way of protecting him in the exercise of his discretion. Especially should he have this indulgence when he appears to have acted from good motives and not from anger or malice. Hence the teacher is not to be held liable on the ground of excess of punishment, unless the punishment is *clearly* excessive and would be held so in the general judgment of reasonable men. If the punishment be thus *clearly* excessive, then the master should be held liable for such excess, though he acted from good motives in inflicting the punishment, and in his own judgment considered it necessary and not excessive. But if there is any reasonable doubt whether the punishment was excessive, the master should have the benefit of the doubt. Upon this point there was error in the charge.

III. The court admitted evidence to show that the general character of the defendant, as a master, in governing his school, was mild and moderate.

As the court put the case to the jury upon the question of the defendant's malice in inflicting the punishment, this evidence, in that view, might be admissible as tending to disprove such intent. It might, perhaps, be properly said that the nature of such an action, turning upon that point, involved the character of the defendant.

But as we have already decided that the question of excessive punishment is not affected by the motive or intent of the master, we are of opinion that this evidence of general good character is not admissible upon that issue. Good character does not tend to

prove that the assault and battery were or were not committed, or that the punishment was or was not excessive.

But when evidence is given tending to show that the master acted maliciously or wantonly, from an evil heart, and the plaintiff claims to recover damages on that ground, there we think the evidence would be admissible, (1 Greenleaf's Evidence, sec. 54 and notes,) to rebut such intent. But it should be strictly limited to that purpose. In other respects we find no error in the charge.

IV. Whether a rawhide was a proper instrument of punishment was left to the jury with very suitable instructions.

The evidence to show that the rawhide was used in other schools in the vicinity was properly admitted to rebut the charge of malice, by showing that he did not resort to an unusual instrument of punishment.

The testimony to show the plaintiff did not claim an excess of punishment on the first trial was proper, as tending to prove that that claim on the then pending trial was not well founded.

Judgment reversed