Burdick v. Babcock.

BURDICK v. BABCOCK et al.

CHANDLER v. SAME.

I. Per CURIAM.

1. Schools: ENFORCEMENT OF RULES: DISMISSAL OF PUPILS.  Under the constitution and laws of Iowa, it is competent for boards of school directors to provide by rules, that pupils may be suspended from the schools in case they shall be absent or tardy, except for sickness or other unavoidable cause, a certain number of times within a fixed period.

2. —— Such rules are reasonable and proper for the government of schools, and their enforcement is essential to their well-being and the success of pupils therein.

II. Per MILLER, J., dissenting.

3. —— The power under the statute and constitution, to provide by rules or regulations for the government of schools is limited to the conduct of pupils while at school, and cannot (except in cases of gross immorality) extend to the conduct of pupils out of school, or their failure to attend and the like.  These matters are within the rightful control of the parent or guardian.

*Appeal from Winneshiek District Court.*

MONDAY, JUNE 19.

THESE cases involve substantially the same facts.  They are actions at law, and the pleadings in each set up the same causes of action and defense.

The defendant Babcock is the superintendent of the schools of the independent school district of Decorah; the other defendants are the board of directors of that district. Previous to the acts which are made the foundation of plaintiff's actions, the defendants, in their official capacity as directors and teacher, adopted and promulgated, for

the government of the schools under their charge, the following, among other rules :

"RULE 10. — Any pupil who is absent six half-days in any consecutive four weeks, and two times tardy, shall be counted as one absent, unless detained by sickness or other unavoidable cause, and shall be suspended from the schools until the end of the term, or until re-instated by the superintendent or board."

"RULE 11. — Teachers may require absence and tardiness to be certified to by parent or guardian, in writing or personally, or by special messenger. All lessons lost on account of absence may be made up at the discretion of the teacher."

"RULE — . — Pupils may be excused from the public schools for the purpose of receiving instruction elsewhere, not to exceed two hours in any week, at such times as shall not interfere with their regular recitations in school."

The plaintiffs in these cases were pupils in the public schools of the district, and for absence and tardiness, under rule 10, were suspended. In the first case the teacher informed the father of the plaintiff of the fact of his son's absence and tardiness, and that he would be re-instated if a proper excuse were rendered for him, and assurance given that the acts would not be repeated. The father informed the teacher that his son had been kept at home to perform certain labor, and was for that reason absent and tardy at school ; that he could give no assurance against the repetition of the fault, and claimed the right to detain his child from school at any time for like reasons, and, notwithstanding the rule and action under it, to send him to the school.

In the second case, the plaintiff had been kept from school by her parents, for the purpose of being taken with them upon a visit. The parents represented that, as they were in humble circumstances, they could not leave their children at home when they made a visit, and for that rea-

·son found it necessary to· take the child with them.   The absence for which plaintiff was suspended was the second offense of the kind by her against the rules of the school.

The petition claims damages for the suspension of the plaintiff, and prays that defendant be restrained from enforcing the rule, and required by proper order to admit plaintiffs into the school.   A preliminary injunction to that effect was allowed in each case, which was made perpetual at the final hearing upon motion to dissolve, and judgments for costs were rendered against defendants, who appeal in each case.

*Willett & Burnett* for the appellants.

*Cooley & Patterson* for the appellee.

Beck, J. — The decision of these cases turns upon the power of the board of directors of the school district to establish and enforce the rules, especially rule 10, under which the plaintiffs were suspended from the school.   The fact of plaintiffs' disobedience of this rule is not denied : the simple question for us to determine is this : Has the board authority to prescribe, and through the teacher to enforce, the rule in question by the suspension of a pupil who disobeys it from the privileges of the school ?

The board of directors of each school district of the State are empowered to " select a person who shall have the general supervision of the schools of their district, subject to the rules and regulations of the board."   Acts 9th General Assembly, ch. 172, § 22.

They are required to aid the teachers in establishing and enforcing rules for the government of the schools (sec. 27) ; and the sub-director " shall have power, with the concurrence of the president of the board of directors, to dismiss any pupil from the schools of his sub-district, for gross immorality, or for persistent violation of the regula-

tions of the school; and to re-admit them, if he deem proper so to do." Sec. 51. Independent districts possess the same powers, and are governed by the same laws, so far as they may be applicable, as district townships. Sec. 89.

From the foregoing references to the statute, it indisputably appears that the defendants in these cases, being the board of directors and superintendent of schools of the district, are clothed with authority to establish all reasonable and proper rules for the government of the schools, and to control the conduct of the pupils attending the same. The power to dismiss from the school pupils who persistently violate such regulations is expressly conferred. Upon these points there can be no question, and we do not understand that plaintiff's counsel deny that the law is as above stated. But it is insisted that the rule in question is unreasonable, and in its enforcement operates oppressively and unjustly toward the pupils.

2. The point thus presented for our determination is narrowed to the single question: Is the rule under which plaintiffs were suspended from the school reasonable and proper?

The object of public schools, as established by our laws, is to secure education to the children of the State. The intention of the law is, not that the children shall, at certain times or on certain days, be simply gathered together, but that, when assembled, they shall be instructed. Their progress in learning is the grand object of the law. It intends that the school shall be so conducted that the children shall acquire the greatest benefits by making the most rapid advances in the acquisition of knowledge and mental discipline.

Any rule of the school, not subversive of the rights of the children or parents, or in conflict with humanity and the precepts of divine law, which tends to advance the object of the law in establishing public schools, must be considered reasonable and proper.

It requires but little experience in the instruction of children and youth to convince any one that the only means which will assure progress in their studies is to secure their attendance—the application of the powers of their minds to the studies in which they are instructed. Unless the pupil's mind is open to receive instruction, vain will be the effort of the teacher to lead him forward in learning. This application of the mind in children is secured by interesting them in their studies. But this cannot be done if they are at school one day and at home the next — if a recitation is omitted or a lesson left unlearned at the whim or convenience of parents. In order to interest a child he must be able to understand the subject in which he is instructed. If he has failed to prepare previous lessons, he will not understand the one which the teacher explains to him. If he is required to do double duty, and prepare a previous lesson, omitted in order to make a visit, or do an errand at home, with the lesson of the day, he will fail to master them, and become discouraged. The inevitable consequence is that his interest flags, and he is unable to apply the powers of his mind to the studies before him. The rule requiring constant and prompt attendance is for the good of the pupil, and to secure the very objects the law had in view in establishing public schools. It is therefore reasonable and proper..

In another view it is required by the best interest of all the pupils of the school.

Irregular attendance of pupils not only retards their own progress, but interferes with the progress of those pupils who may be regular and prompt. The whole class may be annoyed and hindered by the imperfect recitations of one who has failed to prepare his lessons on account of absence. The class must endure and suffer the blunders, promptings and reproofs of the irregular pupil, all resulting from failure to prepare lessons which should have been

studied when the child's time was occupied by direction of the parent in work or visiting.

Tardiness, that is, arriving late, is a direct injury to the whole school. The confusion of hurrying to seats, gathering together of books, etc., by tardy ones, at a time when all should be at study, cannot fail to greatly impede the progress of those who are regular and prompt in attendance. The rule requiring prompt and regular attendance is demanded for the good of the whole school. While it may be admitted that absence and tardiness are acts committed out of school hours, yet as their effects and consequences operate upon the school — the pupils when assembled for instruction — they are therefore subject to control by rules for the government of the schools. If the effects of acts done out of school-houses reach within the school-room during school hours and are detrimental to good order and the best interest of the pupils, it is evident that such acts may be forbidden. Truancy is a fault committed away from school. Can it be pretended that it cannot be reached for correction by the school board and teachers? A pupil may engage in sports beyond school that will render him unfit to study during school hours. Cannot these sports be forbidden? The view that acts, to be within the authority of the school board and teachers for discipline and correction, must be done within school hours, is narrow, and without regard to the spirit of the law and the best interest of our common schools. It is in conflict, too, with authority. See upon this point, *Lander* v. *Seaver*, 32 Vt. 114, and *Sherman* v. *Inhabitants of Charlestown*, 8 Cush. 160, the doctrine we have above endeavored to sustain is, in these cases, distinctly announced.

The rule in question as we have shown operates directly upon the order of the school — upon the pupils when assembled for instruction. It promotes efficiency to the school, and secures the progress of the pupils in their studies. It is, therefore, a rule for the *government of the*

*school*, and must be regarded as proper and reasonable, and within the authority of the school officers to prescribe and enforce.

3. It is argued that the rule interferes with parental authority, inasmuch as it deprives the parent of his right to the services and society of the child at times when he may require them. The argument has equal force against all schools, for it is obvious that the child cannot both attend school and at the same time be engaged in labor for the parent, or in his society. The services and society of the child during school hours cannot be at the disposal of the father. If the parent would bestow on his offspring the great benefits of an education, he must forego the little profit of the child's labor and the pleasure of his constant society. If he would have him make proper advances in school, he must not distract his attention and slacken his interest by interruptions for a day or two in a week, or an hour or so in a day, for the little advantage that may be derived from his labor during such times. Neither has the parent the right to interfere with the order of the school or the progress of other pupils, by sending his own child at times and in a condition that will, as we have seen, prove an annoyance and hindrance to others.

As we all surrender to society some of our natural rights that we may enjoy its great advantages, so must the parent give up the society and service of his child for the incalculably greater benefit of the education which his offspring will receive from attendance at the public school.

4. Again, it is said that the rules visit upon the child punishment for the parent's offense. That is, the child is kept from school through the fault of the parent, and is punished for the act of the parent in detaining him. If the good of the children were to be considered only, there would be force in this argument; but it is completely answered by the consideration that the parent's act is an injury to the whole school. He makes the child, in the

Burdick v. Babcock.

exercise of his authority, a source of annoyance and abso-
lute injury to all the other pupils of the school. This he
cannot do. The child, through no fault of his own or of his
parents, may be afflicted with a contagious disease, yet, as
the good of other pupils demanded it, he may be for that
reason forbidden attendance at the school. *Spear* v. *Cum-
mings*, 23 Pick. 225. So, if, by the exercise of parental
authority, the child is made to act in such a manner as to
interfere with the progress of his fellow pupils, it is the
duty of those having charge of the school to remove the
evil by dismissing the pupil causing it. The good of the
whole school cannot be sacrificed for the advantage of one
pupil who has an unreasonable father. Upon the parent
must rest the great responsibility of depriving his child of
the opportunities of education, which the laws of the State
so generously offer. If the education of children were
compulsory upon parents, who could be reached by proper
penalties, as for an offense for failure to send their children
to school, in that case the child could be relieved from the
hardship of expulsion, and the parent made responsible for
his acts in detaining him from school. As the law now is,
no other means can be devised for enforcing the rule
requiring regular and prompt attendance, than the penalty
of expulsion.

The foregoing views, it is believed, are sustained by the
following cases: *Sherman* v. *Inhabitants of Charlestown*,
8 Cush. 160 ; *Donahoe* v. *Richards*, 38 Me. 379 ; *Landes*
v. *Seaver*, 32 Vt. 114; *Gurney* v. *Pelkin*, 32 Vt. 224 ;
*Speller* v. *Inhabitants of Woburn*, 12 Allen, 127.

5. It is urged as an objection to the rules in question
that poor parents who require at certain times of the day,
as the morning hours or during the whole of school days,
the services of their children to aid in earning their sup-
port, will be prohibited sending to the public schools. But
this application of the rules is foreign to their spirit, and it
cannot be presumed that they will be unjustly and wanton-

ly enforced in cases not in their spirit. The 10th rule provides that absence and tardiness, unless from sickness *or other unavoidable causes*, shall be punished by suspension; and the 11th rule provides that the parents may be required to certify the cause of absence and tardiness. Now we cannot believe that a school board or school teacher within our State would not accept as an unavoidable cause of absence or delay in reaching school, the fact that the child's services, at such times, were demanded for its own support or that of its parent. In such cases the school boards and teachers would be bound to permit inconvenience and annoyance to other pupils, which we have above pointed out, for the sake of such unfortunate ones, upon whom want has enforced the necessity of labor during school hours. No such case as this is made by the records before us.

In the first case the son was detained from school to do some work in preparing " shrubbery for winter," and his tardiness resulted from the fact that he had " two cows to take care of," and was required " to do the marketing for the family." These facts do not indicate a condition in life that requires the labor of a lad either for his own sup port or for that of his parents.

In the other case, the daughter was kept from school to visit with her parents. A family that can afford to visit may well keep their children at school, and if this can only be done by the parents' depriving themselves of the pleasures of visiting, it is not too great a sacrifice to secure the great benefits of education to their offspring.

The judgments of the district court are reversed, and the causes are remanded for proceedings and judgments in accordance with this opinion.

Reversed.

COLE, J. — I concur fully in the conclusion reached by the foregoing opinion. I ground my determination chief-

ly upon this: Our constitution has clothed the legislature with the *power*, and has expressly devolved upon it the *duty*, of "providing for the education of all the youths of the State through a system of common schools." Art. 9, § 12. It is expressly given "full power and authority to legislate and make all needful rules and regulations in relation to common schools." Art. 9, § 8. And, as if to indicate the propriety of forfeiting rights, the constitution declares that "any district failing for two consecutive years to organize and keep up a school may be deprived of their portion of the school fund." The legislature being thus invested with *full power* to make all needful rules and regulations, which by legislative enactments has been given to the district boards, it would at least require proof of gross abuse of that legislative discretion to justify a court in declaring a rule unconstitutional, and hence illegal. No such abuse is shown in this case. It being thus within the *power* of the board of directors, they are responsible for its exercise, and courts cannot properly either restrain or annul their action.

MILLER, J. (dissenting) — I am unable to give my assent to the conclusions of the opinions announced in these cases, or to the reasons on which they are founded.

The question involved is one of power. It is, whether the defendants have the power or legal authority to expel the plaintiffs from the public schools for the causes shown. The people of the State have imposed the duty upon the legislature to "provide for the education of all the youths of the State, through a system of common schools." § 12, art. 9, New Constitution; § 15, of same art., and ch. 172, Laws of 1862. The munificent grant made by the general government to the people of the State for the purposes of education has been confided by them to the legislature, upon whom they have imperatively enjoined this duty of providing for the education of all the youths

of the State. Not some of them, but all. Not the rich
only, but the poor also. In obedience to the will of the
people thus expressed, the general assembly have adopted
such legislation as to them seemed appropriate to secure
to the youths of the State, without distinction of race,
color or sex, the benefits of a common school education.
See ch. 172, Laws of 1862. As appropriate means to
this, the legislature, by that chapter, has divided the State·
into school districts, created them bodies corporate, pro-
vided the time and mode of electing officers, defined their
duties and limited their powers. Each civil township
that is now or may be hereafter organized in the several
counties of the State constitutes a school district, and
" any city or town containing within its limits not less
than three hundred inhabitants, and certain territory
contiguous thereto, may be constituted a separate school
district." Sec. 48. When so constituted such separate
school districts " shall be governed by the laws enacted
· for the regulation of district townships so far as the same
may be applicable." Sec. 89.

These school districts are created and belong to that
class of. corporations denominated *public* or *political* cor-
porations, created by the legislature and invested with
certain powers, and have for their objects the government
of the schools of the State. They are the auxiliaries of
the State government in that important branch of municipal
regulation that pertains to the education of the youths of
the State by *public* benefaction.

The doctrine is well settled and elementary, that this
class of corporations have and can exercise such powers,
and such only, as are expressly granted by the legislature,
and such incidental ones as are *necessary* for the purpose
of carrying into effect the powers expressly granted, and
that these powers are to be strictly and closely construed.
2 Kent's Com. 299 ; *Clarke* v. *City of Des Moines*, 19
Iowa, 199; *Clark, Dodge & Co.* v. *The City of Davenport*,

14 id. 494;· *The City of Burlington* v. *Kellar*, 18 id. 60; *Mintrow* v. *Lane*, 23 How. (U. S.) 435.

This class of corporations being the mere creatures of the law, created for particular and specific purposes, deriving all their powers from the law creating them, it is held to be perfectly just and proper that they should be confined strictly within the powers conferred upon them by the legislature, and that they are obliged strictly to show their authority for what it assumes to do. So, also, the acts of the officers and agents of the corporations are construed with equal strictness. They cannot transcend the powers conferred upon the corporation itself, so as to bind the corporation or justify their own acts. See authorities above cited, and see, also, *Cochran* v. *McCleary*, 22 Iowa, 75.

In the light of these well-established rules of law I proceed to examine what power, if any, the legislature has conferred upon these corporations to expel pupils from the public schools. Section 51 of the act before referred to provides that the sub-director "shall have power, with the concurrence of the president of the board of directors, to *dismiss* any pupil from the schools of his district, *for gross immorality*, or for persistent violation of the regulations of the school, and to re-admit them if he deems proper so to do." In this section is contained the only grant of power possessed by these corporations to dismiss a pupil from the public schools. It designates the officers upon whom the power is conferred, and the causes for which the power may be exercised, and the power can be exercised by no other officer or person and for no other causes than those specified. *Expressio est unius, exclusio alterius.* For *two* causes then, and for two only, is authority conferred on the sub-director, or, in case of a city or town, upon the board of directors, to dismiss a pupil from the schools, viz.: "for gross immorality, or for persistent violation of the regulations of the school." It is not pretended that the pupils, in the cases before us, were expelled for the cause first

named, but for the second. Let us examine this claim of power. The 27th section of the school law (ch. 172, Laws of 1862) authorizes the board of directors " to visit the schools in their district, and aid the teachers in establishing and enforcing rules for the government of the schools." Under this section the board of directors of the independent school district of Decorah, assumed the authority to adopt what they designate as "rule 10," which is as follows:

"Any pupil who is absent six half days in any consecutive four weeks, and two times tardy shall be counted as once absent, unless detained by sickness or other unavoidable cause, and shall be suspended from the schools until the end of the term, or until re-instated by the superintendent or board." Acting under this pretended rule the superintendent, one of the appellants, suspended the plaintiffs in these cases.

Now, in the first place, I utterly deny the authority of the board to establish and enforce this so-called rule, because the statute has conferred upon them only the power to establish and enforce " rules for the *government of the schools as such ;*" and this rule is in no respect one for that purpose. It is a rule—to state it mildly—for the regulation of parents and guardians who send pupils to the public schools, and also for the government of the pupils out of and away from school. A school is a congregation of pupils for the purpose of instruction by teachers, and all regulations applying to such pupils in such congregated capacity are properly called rules for the government of the school, but rules which do not apply to them in such congregated capacity, are not, in any correct sense, rules for the government of the school. The rule under consideration says to the parent, " you must so regulate your affairs that your child shall attend school thus and so, or, if you do not, your child shall be denied the privilege of attending during our sovereign pleasure. This is no more a rule for the *government* of the *school* than would be one

requiring each pupil to retire to rest at night at a specified time, and rise in the morning at a stated hour, although both might be excellent precepts. There is just as much authority for the one as there is for the other, and no more. The power to make and enforce rules is limited by the statute to those which are for the government of a school as a congregation of pupils, and for the government of the conduct of each while constituting a part of such congregation or school. With the dissolution of this congregation or school the government thereof ceases to operate — having nothing to operate upon — and the government of the parent or guardian attaches and is exclusive. With this parental government the law has conferred no authority on the school board to interfere or in any manner control. When the pupil returns to and becomes a part of the school the government of the parent is, for the time being, surrendered to the school government. The pupil must then regulate his conduct by the rules for the government of the school. This he is bound to do. But out of school he is under the exclusive government of parental authority, and if under that authority he is prevented from attending punctually at school, there is no power conferred on the school board to deny him admission to the schools altogether for that misfortune. The parent, whose authority the child must obey, deprives him, necessarily or otherwise, of a portion of his school privileges by keeping him at home for a few days, and then the school directors *for that cause alone* deprive him of *all* its benefits ; such is the working of the rule in these cases. The pupil is thus deprived of the benefits of the public schools without any fault on his part. Such a construction of the law would destroy its very object and purpose, which is to afford a common school education to all the youths of the State, and is subversive of constitutional rights.

Again, if the board has the power to expel a pupil from the schools for being absent six half-days, they may do so

for being absent one half day, or for one half hour, or minute, or for any other act or omission of the pupil away from the school as their caprice may dictate. If they have power to make a rule denying admission to pupils on account of absence, except for sickness, they have the power to make the rule absolute, and expel them for absence even in case of sickness. If they have the power claimed in this case, to make rules regulating the conduct of parents and pupils out of school, such power is only limited by the discretion or caprice of the board, for it will not be pretended that if the power exists the court can regulate the discretion of the board. See *Clark* v. *Independent School District of Muscatine*, 24 Iowa, '266.

But it is said that it will not be presumed the board will act improperly or unreasonably in making such rules as they in their discretion may deem proper to adopt. Without conceding this presumption, it is sufficient to say that it affords no argument in support of the exercise of the unauthorized act of a corporation or its officers. The question is not whether the act is *reasonable*, but whether it is *authorized*. This question the majority opinion entirely fails to meet, in my judgment. The power to make the rule is assumed, and its propriety only discussed and approved.

To my mind it is beyond question that the defendants are not, by the statute, invested with the power to make and enforce the rule under consideration.

In my opinion, to hold otherwise is in direct conflict with the plain words of the statute, and establishes a dangerous principle. The power of excluding a pupil from the public schools for any cause which a board of school directors may, in their discretion, deem conducive of the efficiency of the schools, pursued to its legitimate consequences, will enable them to deprive a large portion of the youths of the State of the benefits of a common school education. If school boards may make any rule,

not for the government of the school as such, which they think will promote the efficiency of the schools, then they may refuse admission altogether to colored children, for it is well known that no other cause has created as much disturbance in our common schools as the admission therein of colored pupils. But this court in *Clark* v. *The Ind. School Dist. of Muscatine*, 24 Iowa, 266, compelled the school board by *mandamus* to receive a colored pupil into the "grammar school" of their district. And Mr. Justice Cole, in the opinion of the court in that case, says: " Our statute has expressed the sovereign will that all the youths of the State between the ages of five and twenty-one years, shall be entitled to the privileges and benefits of our common schools; and it is not competent for the board of directors to resist that sovereign will, and to declare that, since 'public sentiment in their district is opposed to the intermingling of the white and colored children in the same school,' they will deny equal privileges to some of the youths."

In that case the disturbing element of color was held to be no argument in support of the exercise of the unauthorized act. The doctrine of that case holds that although the admission of colored pupils into the schools may be against public sentiment, and impair the efficiency of the schools, yet the board had no power to deny to the pupil the right to attend the schools for that reason; that the board had no discretion in the premises. So I hold in this case, that the law has conferred no discretion upon the board of directors, much less upon the superintendent, to deny to pupils their constitutional and statutory right of attending the public schools in their districts for any cause except those specifically mentioned in the statute. They are not invested with any discretion to dismiss pupils and deprive them of the benefits of the common schools, except for gross immorality; or for a persistent violation of the regulations of the school; and

the rule adopted, and under which the plaintiffs have been excluded from the schools, is in no sense a "*regulation of the school.*" If pupils are not guilty of gross immorality, and do not persistently violate the rules for the regulation of their conduct while at school, there is no authority vested in the board of directors to exclude them from the schools for any other cause.

The cases cited in the majority opinion in support of the power claimed will, upon examination, be found inapplicable to the question in this case. The defendants in these cases derive their authority from the law creating them, and that law is the measure and limit of their powers. To the statute alone are we to look in order to ascertain the powers of these corporations.

When we look there we fail to find any grant of the power claimed by defendants. Nor is it a necessary incident to the powers granted. To uphold the claim of power in these cases erects these school corporations into irresponsible and uncontrollable powers, whose authority is limited only by their notions of propriety, which is contrary to all well-settled rules of construction applicable to corporations. In my opinion the judgment of the court below should be                              Affirmed.