Justice Thomas,
concurring.
The Court today decides that a public school may prohibit speech advocating illegal drug use. I agree and therefore join its opinion in full. I write separately to state my view that the standard set forth in Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503 (1969), is without basis in the Constitution.
I
The First Amendment states that “Congress shall make no law... abridging the freedom of speech.” As this Court has previously observed, the First Amendment was not originally understood to permit all sorts of speech; instead, “[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.” Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572 (1942); see also Cox v. Louisiana, 379 U. S. 536, 554 (1965). In my view, the history of public education suggests that the First Amendment, as originally understood, does not protect stu *411 dent speech in public schools. Although colonial schools were exclusively private, public education proliferated in the early 1800’s. By the time the States ratified the Fourteenth Amendment, public schools had become relatively common. W. Reese, America’s Public Schools: From the Common-School to “No Child Left Behind” 11-12 (2005) (hereinafter Reese). If students in public schools were originally understood as having free-speech rights, one would have expected 19th-century public schools to have respected those rights and courts to have enforced them.[1] They did not.
A
During the colonial era, private schools and tutors offered the only educational opportunities for children, and teachers managed classrooms with an iron hand. R. Butts & L. Cremin, A History of Education in American Culture 121, 123 (1953) (hereinafter Butts). Public schooling arose, in part, as a way to educate those too poor to afford private schools. See Kaestle & Vinovskis, From Apron Strings to ABCs: Parents, Children, and Schooling in Nineteenth-Century Massachusetts, 84 Am. J. Sociology S39, S49 (Supp. 1978). Because public schools were initially created as substitutes for private schools, when States developed public education systems in the early 1800’s, no one doubted the government’s ability to educate and discipline children as private schools did. Like their private counterparts, early public schools were not places for freewheeling debates or exploration of competing ideas. Rather, teachers instilled “a core of common values” in students and taught them self-control. Reese 23; A. Potter & G. Emerson, The School and *412 the Schoolmaster: A Manual 125 (1843) (“By its discipline it contributes, insensibly, to generate a spirit of subordination to lawful authority, a power of self-control, and a habit of postponing present indulgence to a greater future good ... ”); D. Parkerson & J. Parkerson, The Emergence of the Common School in the U. S. Countryside 6 (1998) (hereinafter Parkerson) (noting that early education activists, such as Benjamin Rush, believed public schools “help[ed] control the innate selfishness of the individual”).
Teachers instilled these values not only by presenting ideas but also through strict discipline. Butts 274-275. Schools punished students for behavior the school considered disrespectful or wrong. Parkerson 65 (noting that children were punished for idleness, talking, profanity, and slovenliness). Rules of etiquette were enforced, and courteous behavior was demanded. Reese 40. To meet their educational objectives, schools required absolute obedience. C. Northend, The Teacher’s Assistant or Hints and Methods in School Discipline and Instruction 44,52 (1865) (“I consider a school judiciously governed, where order prevails; where the strictest sense of propriety is manifested by the pupils towards the teacher, and towards each other ...” (internal quotation marks omitted)).[2]
In short, in the earliest public schools, teachers taught, and students listened. Teachers commanded, and students obeyed. Teachers did not rely solely on the power of ideas to persuade; they relied on discipline to maintain order.
*413 B
Through the legal doctrine of in loco parentis, courts upheld the right of schools to discipline students, to enforce rules, and to maintain order.[3] Rooted in the English common law, in loco parentis originally governed the legal rights and obligations of tutors and private schools. 1 W. Blackstone, Commentaries on the Laws of England 441 (1765) (“[A parent] may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then in loco parentis, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed”). Chancellor James Kent noted the acceptance of the doctrine as part of American law in the early 19th century. 2 J. Kent, Commentaries on American Law *205, *206-*207 (“So the power allowed by law to the parent over the person of the child may be delegated to a tutor or instructor, the better to accomplish the purpose of education”).
As early as 1837, state courts applied the in loco parentis principle to public schools:
“One of the most sacred duties of parents, is to train up and qualify their children, for becoming useful and virtuous members of society; this duty cannot be effectually performed without the ability to command obedience, to control stubbornness, to quicken diligence, and *414 to reform bad habits.... The teacher is the substitute of the parent;... and in the exercise of these delegated duties, is invested with his power.” State v. Pendergrass, 19 N. C. 365, 365-366 (1837).
Applying in loco parentis, the judiciary was reluctant to interfere in the routine business of school administration, allowing schools and teachers to set and enforce rules and to maintain order. Sheehan v. Sturges, 53 Conn. 481, 483-484, 2 A. 841, 842 (1885). Thus, in the early years of public schooling, schools and teachers had considerable discretion in disciplinary matters:
“To accomplish th[e] desirable ends [of teaching self-restraint, obedience, and other civic virtues], the master of a school is necessarily invested with much discretionary power.... He must govern these pupils, quicken the slothful, spur the indolent, restrain the impetuous, and control the stubborn. He must make rules, give commands, and punish disobedience. What rules, what commands, and what punishments shall be imposed, are necessarily largely within the discretion of the master, where none are defined by the school board.” Patterson v. Nutter, 78 Me. 509, 511, 7 A. 273, 274 (1886).[4]
A review of the case law shows that in loco parentis allowed schools to regulate student speech as well. Courts routinely preserved the rights of teachers to punish speech that the school or teacher thought was contrary to the interests of the school and its educational goals. For example, the Vermont Supreme Court upheld the corporal punishment of a student who called his teacher “Old Jack Seaver” in *415 front of other students. Lander v. Seaver, 32 Vt. 114, 115 (1859). The court explained its decision as follows:
“[L]anguage used to other scholars to stir up disorder and subordination, or to heap odium and disgrace upon the master; writings and pictures placed so as to suggest evil and corrupt language, images and thoughts to the youth who must frequent the school; all such or similar acts tend directly to impair the usefulness of the school, the welfare of the scholars and the authority of the master. By common consent and by the universal custom in our New England schools, the master has always been deemed to have the right to punish such offences. Such power is essential to the preservation of order, decency, decorum and good government in schools.” Id., at 121.
Similarly, the California Court of Appeal upheld the expulsion of a student who gave a speech before the student body that criticized the administration for having an unsafe building “because of the possibility of fire.” Wooster v. Sunderland, 27 Cal. App. 51, 52, 148 P. 959 (1915). The punishment was appropriate, the court stated, because the speech “was intended to discredit and humiliate the board in the eyes of the students, and tended to impair the discipline of the school.” Id., at 55, 148 P., at 960. Likewise, the Missouri Supreme Court explained that a “rule which forbade the use of profane language [and] quarrelling” “was not only reasonable, but necessary to the orderly conduct of the school.” Deskins v. Gose, 85 Mo. 485, 487, 488 (1885). And the Indiana Supreme Court upheld the punishment of a student who made distracting demonstrations in class for “a breach of good deportment.” Vanvactor v. State, 113 Ind. 276, 281, 15 N. E. 341, 343 (1888).[5]
*416 The doctrine of in loco parentis limited the ability of schools to set rules and control their classrooms in almost no way. It merely limited the imposition of excessive physical punishment. In this area, the case law was split. One line of cases specified that punishment was wholly discretionary as long as the teacher did not act with legal malice or cause permanent injury. E. g., Boyd v. State, 88 Ala. 169, 170-172, 7 So. 268, 269 (1890) (allowing liability where the “punishment inflicted is immoderate, or excessive, and ... it was induced by legal malice, or wickedness of motive”). Another line allowed courts to intervene where the corporal punishment was “clearly excessive.” E. g., Lander, supra, at 124. Under both lines of cases, courts struck down only punishments that were excessively harsh; they almost never questioned the substantive restrictions on student conduct set by teachers and schools. E. g., Sheehan, supra, at 483-484, 2 A., at 842; Gardner v. State, 4 Ind. 632, 635 (1853); Anderson v. State, 40 Tenn. 455, 456 (1859); Hardy v. James, 5 Ky. Op. 36 (1872).[6] **6
II
Tinker effected a sea change in students’ speech rights, extending them well beyond traditional bounds. The case *417 arose when a school punished several students for wearing black armbands to school to protest the Vietnam War. 393 U. S., at 504. Determining that the punishment infringed the students’ First Amendment rights, this Court created a new standard for students’ freedom of speech in public schools:
“[W]here there is no finding and no showing that engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school, the prohibition cannot be sustained.” Id., at 509 (internal quotation marks omitted).
Accordingly, unless a student’s speech would disrupt the educational process, students had a fundamental right to speak their minds (or wear their armbands) — even on matters the school disagreed with or found objectionable. Ibid. (“[The school] must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint”).
Justice Black dissented, criticizing the Court for “subjecting] all the public schools in the country to the whims and caprices of their loudest-mouthed, but maybe not their brightest, students.” Id., at 525. He emphasized the instructive purpose of schools: “[T]axpayers send children to school on the premise that at their age they need to learn, not teach.” Id., at 522. In his view, the Court’s decision “surrender[ed] control of the American public school system to public school students.” Id., at 526.
Of course, Tinker’s reasoning conflicted with the traditional understanding of the judiciary’s role in relation to public schooling, a role limited by in loco parentis. Perhaps for that reason, the Court has since scaled back Tinker’s standard, or rather set the standard aside on an ad hoc basis. In Bethel School Dist. No. 403 v. Fraser, 478 U. S. 675, 677, 678 *418 (1986), a public school suspended a student for delivering a speech that contained “an elaborate, graphic, and explicit sexual metaphor.” The Court of Appeals found that the speech caused no disruption under the Tinker standard, and this Court did not question that holding. 478 U. S., at 679-680. The Court nonetheless permitted the school to punish the student because of the objectionable content of his speech. Id., at 685 (“A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audienee of teenage students”). Signaling at least a partial break with Tinker, Fraser left the regulation of indecent student speech to local schools.[7] 478 U. S., at 683.
Similarly, in Hazelwood School Dist. v. Kuhlmeier, 484 U. S. 260 (1988), the Court made an exception to Tinker for school-sponsored activities. The Court characterized newspapers and similar school-sponsored activities “as part of the school curriculum” and held that “[ejducators are entitled to exercise greater control over” these forms of student expression., 484 U. S., at 271. Accordingly, the Court expressly refused to apply Tinker’s standard. 484 U. S., at 272-273. Instead, for school-sponsored activities, the Court created a new standard that permitted school regulations of student speech that are “reasonably related to legitimate pedagogical concerns.” Id., at 273.
Today, the Court creates another exception. In doing so, we continue to distance ourselves from Tinker, but we neither overrule it nor offer an explanation of when it operates and when it does not. Ante, at 404-409. I am afraid that our jurisprudence now says that students have a right to speak in schools except when they do not — a standard continuously developed through litigation against local schools and their administrators. In my view, petitioners could prevail for a much simpler reason: As originally understood, the *419 Constitution does not afford students a right to free speech in public schools.
Ill
In light of the history of American public education, it cannot seriously be suggested that the First Amendment “freedom of speech” encompasses a student’s right to speak in public schools. Early public schools gave total control to teachers, who expected obedience and respect from students. And courts routinely deferred to schools’ authority to make rules and to discipline students for violating those rules. Several points are clear: (1) Under in loco parentis, speech rules and other school rules were treated identically; (2) the in loco parentis doctrine imposed almost no limits on the types of rules that a school could set while students were in school; and (3) schools and teachers had tremendous discretion in imposing punishments for violations of those rules.
It might be suggested that the early school speech cases dealt only with slurs and profanity. But that criticism does not withstand scrutiny. First, state courts repeatedly reasoned that schools had discretion to impose discipline to maintain order. The substance of the student’s speech or conduct played no part in the analysis. Second, some cases involved punishment for speech on weightier matters, for instance a speech criticizing school administrators for creating a fire hazard. See Wooster, 27 Cal. App., at 52-53, 148 P., at 959. Yet courts refused to find an exception to in loco parentis even for this advocacy of public safety.
To be sure, our educational system faces administrative and pedagogical challenges different from those faced by 19th-century schools. And the idea of treating children as though it were still the 19th century would find little support today. But I see no constitutional imperative requiring public schools to allow all student speech. Parents decide whether to send their children to public schools. Cf. Hamilton v. Regents of Univ. of Cal., 293 U. S. 245, 262 *420 (1934) (“California has not drafted or called them to attend the university. They are seeking education offered by the State and at the same time insisting that they be excluded from the prescribed course . . . ”); id., at 266 (Cardozo, J., concurring). If parents do not like the rules imposed by those schools, they can seek redress in school boards or legislatures; they can send their children to private schools or homeschool them; or they can simply move. Whatever rules apply to student speech in public schools, those rules can be challenged by parents in the political process.
In place of that democratic regime, Tinker substituted judicial oversight of the day-to-day affairs of public schools. The Tinker Court made little attempt to ground its holding in the history of education or in the original understanding of the First Amendment.[8] Instead, it imposed a new and malleable standard: Schools could not inhibit student speech unless it “substantially interfere^] with the requirements of appropriate discipline in the operation of the school.” 393 U. S., at 509 (internal quotation marks omitted). Inherent *421 in the application of that standard are judgment calls about what constitutes interference and what constitutes appropriate discipline. See id., at 517-518 (Black, J., dissenting) (arguing that the armbands in fact caused a disruption). Historically, courts reasoned that only local school districts were entitled to make those calls. The Tinker Court usurped that traditional authority for the judiciary.
And because Tinker utterly ignored the history of public education, courts (including this one) routinely find it necessary to create ad hoc exceptions to its central premise. This doctrine of exceptions creates confusion without fixing the underlying problem by returning to first principles. Just as I cannot accept Tinker’s standard, I cannot subscribe to Kuhlmeier’s alternative. Local school boards, not the courts, should determine what pedagogical interests are “legitimate” and what rules “reasonably relat[e]” to those interests. 484 U. S., at 273.
Justice Black may not have been “a prophet or the son of a prophet,” but his dissent in Tinker has proved prophetic. 393 U. S., at 525. In the name of the First Amendment, Tinker has undermined the traditional authority of teachers to maintain order in public schools. “Once a society that generally respected the authority of teachers, deferred to their judgment, and trusted them to act in the best interest of school children, we now accept defiance, disrespect, and disorder as daily occurrences in many of our public schools.” Dupre, Should Students Have Constitutional Rights? Keeping Order in the Public Schools, 65 Geo. Wash. L. Rev. 49, 50 (1996). We need look no further than this case for an example: Frederick asserts a constitutional right to utter at a school event what is either “[g]ibberish,” ante, at 402, or an open call to use illegal drugs. To elevate such impertinence to the status of constitutional protection would be farcical and would indeed be to “surrender control of the American public school system to public school students.” Tinker, supra, at 526 (Black, J., dissenting).
*422 * * *
I join the Court’s opinion because it erodes Tinker’s hold in the realm of student speech, even though it does so by adding to the patchwork of exceptions to the Tinker standard. I think the better approach is to dispense with Tinker altogether, and given the opportunity, I would do so.

 Although the First Amendment did not apply to the States until at least the ratification of the Fourteenth Amendment, most state constitutions included free-speech guarantees during the period when public education expanded. E. g., Cal. Const., Art. I, §9 (1849); Conn. Const., Art. I, §5 (1818); Ind. Const., Art. I, §9 (1816).

 Even at the college level, strict obedience was required of students: “The English model fostered absolute institutional control of students by faculty both inside and outside the classroom. At all the early American schools, students lived and worked under a vast array of rules and restrictions. This one-sided relationship between the student and the college mirrored the situation at English schools where the emphasis on hierarchical authority stemmed from medieval Christian theology and the unique legal privileges afforded the university corporation.” Note, 44 Vand. L. Rev. 1135, 1140 (1991) (footnote omitted).

 My discussion is limited to elementary and secondary education. In these settings, courts have applied the doctrine of in loco parentis regardless of the student’s age. See, e. g., Stevens v. Fassett, 27 Me. 266, 281 (1847) (holding that a student over the age of 21 is “liab[le] to punishment” on the same terms as other students if he “present[s] himself as a pupil, [and] is received and instructed by the master”); State v. Mizner, 45 Iowa 248, 250-252 (1876) (same); Sheehan v. Sturges, 53 Conn. 481, 484, 2 A. 841, 843 (1885) (same). Therefore, the fact that Frederick was 18 and not a minor under Alaska law, 439 F. 3d 1114, 1117, n. 4 (CA9 2006), is inconsequential.

 Even courts that did not favor the broad discretion given to teachers to impose corporal punishment recognized that the law provided it. Cooper v. McJunkin, 4 Ind. 290, 291 (1853) (stating that “[t]he public seem to cling to a despotism in the government of schools which has been discarded everywhere else”).

 Courts also upheld punishment when children refused to speak after being requested to do so by their teachers. See Board of Ed. v. Helston, 32 Ill. App. 300, 305-307 (1890) (upholding the suspension of a boy who refused to provide information about who had defaced the school building); *416 cf. Sewell v. Board of Ed. of Defiance Union School, 29 Ohio St. 89, 92 (1876) (upholding the suspension of a student who failed to complete a rhetorical exercise in the allotted time).

 At least nominally, this Court has continued to recognize the applicability of the in loco parentis doctrine to public schools. See Vernonia School Dist. 47J v. Acton, 515 U. S. 646, 654, 655 (1995) (“Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination .... They are subject... to the control of their parents or guardians. When parents place minor children in private schools for their education, the teachers and administrators of those schools stand in loco parentis over the children entrusted to them” (citation omitted)); Bethel School Dist. No. 403 v. Fraser, 478 U. S. 675, 684 (1986) (“These cases recognize the obvious concern on the part of parents, and school authorities acting in loco parentis, to protect children — especially in a captive audience — from exposure to sexually explicit, indecent, or lewd speech”).

 Distancing itself from Tinker’s approach, the Fraser Court quoted Justice Black’s dissent in Tinker. 478 U. S., at 686.

 The Tinker Court claimed that “[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.” 393 U. S., at 506. But the cases the Court cited in favor of that bold proposition do not support it. Tinker chiefly relies upon Meyer v. Nebraska, 262 U. S. 390 (1923) (striking down a law prohibiting the teaching of German). However, Meyer involved a challenge by a private school, id., at 396, and the Meyer Court was quick to note that no “challenge [has] been made of the State’s power to prescribe a curriculum for institutions which it supports,” id., at 402. Meyer provides absolutely no support for the proposition that free-speech rights apply within schools operated by the State. And notably, Meyer relied as its chief support on the Lochner v. New York, 198 U. S. 45 (1905), line of cases, 262 U. S., at 399, a line of cases that has long been criticized, United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U. S. 330 (2007). Tinker also relied on Pierce v. Society of Sisters, 268 U. S. 510 (1925). Pierce has nothing to say on this issue either. Pierce simply upheld the right of parents to send their children to private school. Id., at 535.