(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MAHANOY AREA SCHOOL DISTRICT *v.* B. L., A MINOR, BY AND THROUGH HER FATHER, LEVY, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 20–255.  Argued April 28, 2021—Decided June 23, 2021

Mahanoy Area High School student B. L. failed to make the school's varsity cheerleading squad.  While visiting a local convenience store over the weekend, B. L. posted two images on Snapchat, a social media application for smartphones that allows users to share temporary images with selected friends.  B. L.'s posts expressed frustration with the school and the school's cheerleading squad, and one contained vulgar language and gestures.  When school officials learned of the posts, they suspended B. L. from the junior varsity cheerleading squad for the upcoming year.  After unsuccessfully seeking to reverse that punishment, B. L. and her parents sought relief in federal court, arguing *inter alia* that punishing B. L. for her speech violated the First Amendment.  The District Court granted an injunction ordering the school to reinstate B. L. to the cheerleading team.  Relying on *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, to grant B. L.'s subsequent motion for summary judgment, the District Court found that B. L.'s punishment violated the First Amendment because her Snapchat posts had not caused substantial disruption at the school.  The Third Circuit affirmed the judgment, but the panel majority reasoned that *Tinker* did not apply because schools had no special license to regulate student speech occurring off campus.

*Held*: While public schools may have a special interest in regulating some off-campus student speech, the special interests offered by the school are not sufficient to overcome B. L.'s interest in free expression in this case. Pp. 4–11.

(a) In *Tinker*, we indicated that schools have a special interest in regulating on-campus student speech that "materially disrupts class-

work or involves substantial disorder or invasion of the rights of oth-
ers." 393 U. S., at 513. The special characteristics that give schools
additional license to regulate student speech do not always disappear
when that speech takes place off campus. Circumstances that may
implicate a school's regulatory interests include serious or severe bul-
lying or harassment targeting particular individuals; threats aimed at
teachers or other students; the failure to follow rules concerning les-
sons, the writing of papers, the use of computers, or participation in
other online school activities; and breaches of school security devices.
Pp. 4–6.

(b) But three features of off-campus speech often, even if not always,
distinguish schools' efforts to regulate off-campus speech. *First*, a
school will rarely stand *in loco parentis* when a student speaks off cam-
pus. *Second*, from the student speaker's perspective, regulations of off-
campus speech, when coupled with regulations of on-campus speech,
include all the speech a student utters during the full 24-hour day.
That means courts must be more skeptical of a school's efforts to regu-
late off-campus speech, for doing so may mean the student cannot en-
gage in that kind of speech at all. *Third*, the school itself has an inter-
est in protecting a student's unpopular expression, especially when the
expression takes place off campus, because America's public schools
are the nurseries of democracy. Taken together, these three features
of much off-campus speech mean that the leeway the First Amendment
grants to schools in light of their special characteristics is diminished.
Pp. 6–8.

(c) The school violated B. L.'s First Amendment rights when it sus-
pended her from the junior varsity cheerleading squad. Pp. 8–11.

(1) B. L.'s posts are entitled to First Amendment protection. The
statements made in B. L.'s Snapchats reflect criticism of the rules of a
community of which B. L. forms a part. And B. L.'s message did not
involve features that would place it outside the First Amendment's or-
dinary protection. Pp. 8–9.

(2) The circumstances of B. L.'s speech diminish the school's inter-
est in regulation. B. L.'s posts appeared outside of school hours from
a location outside the school. She did not identify the school in her
posts or target any member of the school community with vulgar or
abusive language. B. L. also transmitted her speech through a per-
sonal cellphone, to an audience consisting of her private circle of Snap-
chat friends. P. 9.

(3) The school's interest in teaching good manners and conse-
quently in punishing the use of vulgar language aimed at part of the
school community is weakened considerably by the fact that B. L.
spoke outside the school on her own time. B. L. spoke under circum-

stances where the school did not stand *in loco parentis*. And the vulgarity in B. L.'s posts encompassed a message of criticism. In addition, the school has presented no evidence of any general effort to prevent students from using vulgarity outside the classroom. Pp. 9–10.

(4) The school's interest in preventing disruption is not supported by the record, which shows that discussion of the matter took, at most, 5 to 10 minutes of an Algebra class "for just a couple of days" and that some members of the cheerleading team were "upset" about the content of B. L.'s Snapchats. App. 82–83. This alone does not satisfy *Tinker's* demanding standards. Pp. 10–11.

(5) Likewise, there is little to suggest a substantial interference in, or disruption of, the school's efforts to maintain cohesion on the school cheerleading squad. P. 11.

964 F. 3d 170, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH and BARRETT, JJ., joined. ALITO, J., filed a concurring opinion, in which GORSUCH, J., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–255

_____

## MAHANOY AREA SCHOOL DISTRICT, PETITIONER *v.* B. L., A MINOR, BY AND THROUGH HER FATHER, LAWRENCE LEVY AND HER MOTHER, BETTY LOU LEVY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 23, 2021]

JUSTICE BREYER delivered the opinion of the Court.

A public high school student used, and transmitted to her Snapchat friends, vulgar language and gestures criticizing both the school and the school's cheerleading team. The student's speech took place outside of school hours and away from the school's campus. In response, the school suspended the student for a year from the cheerleading team. We must decide whether the Court of Appeals for the Third Circuit correctly held that the school's decision violated the First Amendment. Although we do not agree with the reasoning of the Third Circuit panel's majority, we do agree with its conclusion that the school's disciplinary action violated the First Amendment.

## I

### A

B. L. (who, together with her parents, is a respondent in this case) was a student at Mahanoy Area High School, a public school in Mahanoy City, Pennsylvania. At the end of her freshman year, B. L. tried out for a position on the

school's varsity cheerleading squad and for right fielder on a private softball team. She did not make the varsity cheer-leading team or get her preferred softball position, but she was offered a spot on the cheerleading squad's junior var-sity team. B. L. did not accept the coach's decision with good grace, particularly because the squad coaches had placed an entering freshman on the varsity team.

That weekend, B. L. and a friend visited the Cocoa Hut, a local convenience store. There, B. L. used her smartphone to post two photos on Snapchat, a social media application that allows users to post photos and videos that disappear after a set period of time. B. L. posted the images to her Snapchat "story," a feature of the application that allows any person in the user's "friend" group (B. L. had about 250 "friends") to view the images for a 24 hour period.

The first image B. L. posted showed B. L. and a friend with middle fingers raised; it bore the caption: "Fuck school fuck softball fuck cheer fuck everything." App. 20. The sec-ond image was blank but for a caption, which read: "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?" The caption also contained an upside-down smiley-face emoji. *Id.*, at 21.

B. L.'s Snapchat "friends" included other Mahanoy Area High School students, some of whom also belonged to the cheerleading squad. At least one of them, using a separate cellphone, took pictures of B. L.'s posts and shared them with other members of the cheerleading squad. One of the students who received these photos showed them to her mother (who was a cheerleading squad coach), and the im-ages spread. That week, several cheerleaders and other students approached the cheerleading coaches "visibly up-set" about B. L.'s posts. *Id.*, at 83–84. Questions about the posts persisted during an Algebra class taught by one of the two coaches. *Id.*, at 83.

After discussing the matter with the school principal, the

coaches decided that because the posts used profanity in connection with a school extracurricular activity, they violated team and school rules. As a result, the coaches suspended B. L. from the junior varsity cheerleading squad for the upcoming year. B. L.'s subsequent apologies did not move school officials. The school's athletic director, principal, superintendent, and school board, all affirmed B. L.'s suspension from the team. In response, B. L., together with her parents, filed this lawsuit in Federal District Court.

B

The District Court found in B. L.'s favor. It first granted a temporary restraining order and a preliminary injunction ordering the school to reinstate B. L. to the cheerleading team. In granting B. L.'s subsequent motion for summary judgment, the District Court found that B. L.'s Snapchats had not caused substantial disruption at the school. Cf. *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969). Consequently, the District Court declared that B. L.'s punishment violated the First Amendment, and it awarded B. L. nominal damages and attorneys' fees and ordered the school to expunge her disciplinary record.

On appeal, a panel of the Third Circuit affirmed the District Court's conclusion. See 964 F. 3d 170, 194 (2020). In so doing, the majority noted that this Court had previously held in *Tinker* that a public high school could not constitutionally prohibit a peaceful student political demonstration consisting of "'pure speech'" on school property during the school day. 393 U. S., at 505–506, 514. In reaching its conclusion in *Tinker*, this Court emphasized that there was no evidence the student protest would "substantially interfere with the work of the school or impinge upon the rights of other students." *Id.*, at 509. But the Court also said that: "[C]onduct by [a] student, in class or out of it, which for any

reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." *Id.*, at 513.

Many courts have taken this statement as setting a standard—a standard that allows schools considerable freedom on campus to discipline students for conduct that the First Amendment might otherwise protect. But here, the panel majority held that this additional freedom did "not apply to off-campus speech," which it defined as "speech that is outside school-owned, -operated, or -supervised channels and that is not reasonably interpreted as bearing the school's imprimatur." 964 F. 3d, at 189. Because B. L.'s speech took place off campus, the panel concluded that the *Tinker* standard did not apply and the school consequently could not discipline B. L. for engaging in a form of pure speech.

A concurring member of the panel agreed with the majority's result but wrote that the school had not sufficiently justified disciplining B. L. because, whether the *Tinker* standard did or did not apply, B. L.'s speech was not substantially disruptive.

### C

The school district filed a petition for certiorari in this Court, asking us to decide "[w]hether [*Tinker*], which holds that public school officials may regulate speech that would materially and substantially disrupt the work and discipline of the school, applies to student speech that occurs off campus." Pet. for Cert. I. We granted the petition.

### II

We have made clear that students do not "shed their constitutional rights to freedom of speech or expression," even "at the school house gate." *Tinker*, 393 U. S., at 506; see

also *Brown* v. *Entertainment Merchants Assn.*, 564 U. S. 786, 794 (2011) ("[M]inors are entitled to a significant measure of First Amendment protection" (alteration in original; internal quotation marks omitted)). But we have also made clear that courts must apply the First Amendment "in light of the special characteristics of the school environment." *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 266 (1988) (internal quotation mark omitted). One such characteristic, which we have stressed, is the fact that schools at times stand *in loco parentis*, *i.e.*, in the place of parents. See *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 684 (1986).

This Court has previously outlined three specific categories of student speech that schools may regulate in certain circumstances: (1) "indecent," "lewd," or "vulgar" speech uttered during a school assembly on school grounds, see *id.*, at 685; (2) speech, uttered during a class trip, that promotes "illegal drug use," see *Morse* v. *Frederick*, 551 U. S. 393, 409 (2007); and (3) speech that others may reasonably perceive as "bear[ing] the imprimatur of the school," such as that appearing in a school-sponsored newspaper, see *Kuhlmeier*, 484 U. S., at 271.

Finally, in *Tinker*, we said schools have a special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U. S., at 513. These special characteristics call for special leeway when schools regulate speech that occurs under its supervision.

Unlike the Third Circuit, we do not believe the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus. The school's regulatory interests remain significant in some off-campus circumstances. The parties' briefs, and those of *amici*, list several types of off-campus behavior that may call for school

regulation. These include serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons, the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers.

Even B. L. herself and the *amici* supporting her would redefine the Third Circuit's off-campus/on-campus distinction, treating as on campus: all times when the school is responsible for the student; the school's immediate surroundings; travel en route to and from the school; all speech taking place over school laptops or on a school's website; speech taking place during remote learning; activities taken for school credit; and communications to school e-mail accounts or phones. Brief for Respondents 36–37. And it may be that speech related to extracurricular activities, such as team sports, would also receive special treatment under B. L.'s proposed rule. See Tr. of Oral Arg. 71, 85.

We are uncertain as to the length or content of any such list of appropriate exceptions or carveouts to the Third Circuit majority's rule. That rule, basically, if not entirely, would deny the off-campus applicability of *Tinker's* highly general statement about the nature of a school's special interests. Particularly given the advent of computer-based learning, we hesitate to determine precisely which of many school-related off-campus activities belong on such a list. Neither do we now know how such a list might vary, depending upon a student's age, the nature of the school's off-campus activity, or the impact upon the school itself. Thus, we do not now set forth a broad, highly general First Amendment rule stating just what counts as "off campus" speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, *e.g.*, substantial disruption of learning-related activities or the protection of those who make up a

school community.

We can, however, mention three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech. Those features diminish the strength of the unique educational characteristics that might call for special First Amendment leeway.

*First*, a school, in relation to off-campus speech, will rarely stand *in loco parentis*. The doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them. Geographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility.

*Second*, from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day. That means courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all. When it comes to political or religious speech that occurs outside school or a school program or activity, the school will have a heavy burden to justify intervention.

*Third*, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus. America's public schools are the nurseries of democracy. Our representative democracy only works if we protect the "marketplace of ideas." This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will. That protection must include the protection of unpopular ideas, for popular ideas have less need for protection. Thus, schools have a strong interest in ensuring that future generations understand the workings

in practice of the well-known aphorism, "I disapprove of what you say, but I will defend to the death your right to say it." (Although this quote is often attributed to Voltaire, it was likely coined by an English writer, Evelyn Beatrice Hall.)

Given the many different kinds of off-campus speech, the different potential school-related and circumstance-specific justifications, and the differing extent to which those justifications may call for First Amendment leeway, we can, as a general matter, say little more than this: Taken together, these three features of much off-campus speech mean that the leeway the First Amendment grants to schools in light of their special characteristics is diminished. We leave for future cases to decide where, when, and how these features mean the speaker's off-campus location will make the critical difference. This case can, however, provide one example.

## III

Consider B. L.'s speech. Putting aside the vulgar language, the listener would hear criticism, of the team, the team's coaches, and the school—in a word or two, criticism of the rules of a community of which B. L. forms a part. This criticism did not involve features that would place it outside the First Amendment's ordinary protection. B. L.'s posts, while crude, did not amount to fighting words. See *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942). And while B. L. used vulgarity, her speech was not obscene as this Court has understood that term. See *Cohen* v. *California*, 403 U. S. 15, 19–20 (1971). To the contrary, B. L. uttered the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection. See *id.*, at 24; cf. *Snyder* v. *Phelps*, 562 U. S. 443, 461 (2011) (First Amendment protects "even hurtful speech on public issues to ensure that we do not stifle public debate"); *Rankin* v.

*McPherson*, 483 U. S. 378, 387 (1987) ("The inappropri-
ate . . . character of a statement is irrelevant to the question
whether it deals with a matter of public concern").

Consider too when, where, and how B. L. spoke. Her
posts appeared outside of school hours from a location out-
side the school. She did not identify the school in her posts
or target any member of the school community with vulgar
or abusive language. B. L. also transmitted her speech
through a personal cellphone, to an audience consisting of
her private circle of Snapchat friends. These features of her
speech, while risking transmission to the school itself, none-
theless (for reasons we have just explained, *supra*, at 7–8)
diminish the school's interest in punishing B. L.'s utter-
ance.

But what about the school's interest, here primarily an
interest in prohibiting students from using vulgar language
to criticize a school team or its coaches—at least when that
criticism might well be transmitted to other students, team
members, coaches, and faculty? We can break that general
interest into three parts.

*First*, we consider the school's interest in teaching good
manners and consequently in punishing the use of vulgar
language aimed at part of the school community. See App.
35 (indicating that coaches removed B. L. from the cheer
team because "there was profanity in [her] Snap and it was
directed towards cheerleading"); see also *id.*, at 27, 47, and
n. 9, 78, 82. The strength of this anti-vulgarity interest is
weakened considerably by the fact that B. L. spoke outside
the school on her own time. See *Morse*, 551 U. S., at 405
(clarifying that although a school can regulate a student's
use of sexual innuendo in a speech given within the school,
if the student "delivered the same speech in a public forum
outside the school context, it would have been protected");
see also *Fraser*, 478 U. S., at 688 (Brennan, J., concurring
in judgment) (noting that if the student in *Fraser* "had
given the same speech outside of the school environment,

he could not have been penalized simply because govern-
ment officials considered his language to be inappropri-
ate”).

    B. L. spoke under circumstances where the school did not
stand *in loco parentis*. And there is no reason to believe
B. L.’s parents had delegated to school officials their own
control of B. L.’s behavior at the Cocoa Hut. Moreover, the
vulgarity in B. L.’s posts encompassed a message, an ex-
pression of B. L.’s irritation with, and criticism of, the
school and cheerleading communities. Further, the school
has presented no evidence of any general effort to prevent
students from using vulgarity outside the classroom. To-
gether, these facts convince us that the school’s interest in
teaching good manners is not sufficient, in this case, to
overcome B. L.’s interest in free expression.

    *Second*, the school argues that it was trying to prevent
disruption, if not within the classroom, then within the
bounds of a school-sponsored extracurricular activity. But
we can find no evidence in the record of the sort of “substan-
tial disruption” of a school activity or a threatened harm to
the rights of others that might justify the school’s action.
*Tinker*, 393 U. S., at 514. Rather, the record shows that
discussion of the matter took, at most, 5 to 10 minutes of an
Algebra class “for just a couple of days” and that some mem-
bers of the cheerleading team were “upset” about the con-
tent of B. L.’s Snapchats. App. 82–83. But when one of
B. L.’s coaches was asked directly if she had “any reason to
think that this particular incident would disrupt class or
school activities other than the fact that kids kept ask-
ing . . . about it,” she responded simply, “No.” *Id.*, at 84. As
we said in *Tinker*, “for the State in the person of school offi-
cials to justify prohibition of a particular expression of opin-
ion, it must be able to show that its action was caused by
something more than a mere desire to avoid the discomfort
and unpleasantness that always accompany an unpopular
viewpoint.” 393 U. S., at 509. The alleged disturbance here

does not meet *Tinker*'s demanding standard.

*Third,* the school presented some evidence that expresses (at least indirectly) a concern for team morale. One of the coaches testified that the school decided to suspend B. L., not because of any specific negative impact upon a particular member of the school community, but "based on the fact that there was negativity put out there that could impact students in the school." App. 81. There is little else, however, that suggests any serious decline in team morale—to the point where it could create a substantial interference in, or disruption of, the school's efforts to maintain team cohesion. As we have previously said, simple "undifferentiated fear or apprehension . . . is not enough to overcome the right to freedom of expression." *Tinker*, 393 U. S., at 508.

It might be tempting to dismiss B. L.'s words as unworthy of the robust First Amendment protections discussed herein. But sometimes it is necessary to protect the superfluous in order to preserve the necessary. See *Tyson & Brother* v. *Banton*, 273 U. S. 418, 447 (1927) (Holmes, J., dissenting). "We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated." *Cohen*, 403 U. S., at 25.

\*    \*    \*

Although we do not agree with the reasoning of the Third Circuit's panel majority, for the reasons expressed above, resembling those of the panel's concurring opinion, we nonetheless agree that the school violated B. L.'s First Amendment rights. The judgment of the Third Circuit is therefore affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–255

———————

## MAHANOY AREA SCHOOL DISTRICT, PETITIONER *v.* B. L., A MINOR, BY AND THROUGH HER FATHER, LAWRENCE LEVY AND HER MOTHER, BETTY LOU LEVY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 23, 2021]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, concurring.

I join the opinion of the Court but write separately to explain my understanding of the Court's decision and the framework within which I think cases like this should be analyzed. This is the first case in which we have considered the constitutionality of a public school's attempt to regulate true off-premises student speech,[1]

———————

[1] In *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969), not only did the speech occur on school grounds during the regular school day, but our opinion was specifically directed at on-premises speech. See *id.,* at 506 ("It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression *at the schoolhouse gate*" (emphasis added)); *ibid.* ("First Amendment rights, applied in light of the special characteristics of the *school environment*, are available to teachers and students" (emphasis added)); *id.,* at 507 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, *to prescribe and control conduct in the schools*" (emphasis added)); *id.,* at 512–513 (referring to speech that occurs "in the classroom," "in the cafeteria, or on the playing field, or on the campus during the authorized hours"). *Tinker* makes no reference whatsoever to speech that takes place off premises and outside "authorized hours."

and therefore it is important that our opinion not be misunderstood.[2]

## I

The Court holds—and I agree—that: the First Amendment permits public schools to regulate *some* student speech that does not occur on school premises during the regular school day;[3] this authority is more limited than the authority that schools exercise with respect to on-premises speech;[4] courts should be "skeptical" about the constitutionality of the regulation of off-premises speech;[5] the doctrine of *in loco parentis* "rarely" applies to off-premises speech;[6] public school students, like all other Americans, have the right to express "unpopular" ideas on public issues, even when those ideas are expressed in language that some find

––––––––––

All our other cases involving the free-speech rights of public school students concerned speech in school or in a school-sponsored event or publication. See *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 677–678 (1986) (school assembly); *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 262 (1988) (school newspaper); *Morse* v. *Frederick*, 551 U. S. 393, 397 (2007) (display of banner on street near school at school-sponsored event).

[2] This case does not involve speech by a student at a public college or university. For several reasons, including the age, independence, and living arrangements of such students, regulation of their speech may raise very different questions from those presented here. I do not understand the decision in this case to apply to such students.

[3] See *ante*, at 5 (stating that a public school's authority to regulate student speech does not "*always* disappear" when the speech "takes place off campus" (emphasis added)); *ibid.* ("The school's regulatory interests remain significant in *some* off-campus circumstances" (emphasis added)).

[4] See *ante*, at 8 (stating that schools have "diminished" authority to regulate off-premises speech).

[5] See *ante*, at 7 ("[C]ourts must be more skeptical of a school's efforts to regulate off-campus speech").

[6] See *ibid.* ("[A] school, in relation to off-campus speech, will rarely stand *in loco parentis*").

"'inappropriate'" or "'hurtful'";[7] public schools have the duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government;[8] the Mahanoy Area High School violated B. L.'s First Amendment rights when it punished her for the messages she posted on her own time while away from school premises; and the judgment of the Third Circuit must therefore be affirmed.

I also agree that it is not prudent for us to attempt at this time to "set forth a broad, highly general First Amendment rule" governing all off-premises speech. *Ante*, at 6. But in order to understand what the Court has held, it is helpful to consider the framework within which efforts to regulate off-premises speech should be analyzed.

## II

I start with this threshold question: Why does the First Amendment ever allow the free-speech rights of public school students to be restricted to a greater extent than the rights of other juveniles who do not attend a public school? As the Court recognized in *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 509 (1969), when a public school regulates student speech, it acts as an arm of the State in which it is located. Suppose that B. L. had been enrolled in a private school and did exactly what she did in this case—send out vulgar and derogatory messages that focused on her school's cheerleading squad. The Commonwealth of Pennsylvania would have had no legal basis to punish her and almost certainly would not have even tried. So why should her status as a public school student give the Commonwealth any greater authority to punish her speech?

Our cases involving the regulation of student speech have

———————
[7] *Ante*, at 7, 8–9.
[8] *Ante*, at 7–8.

not directly addressed this question. All those cases involved either in-school speech or speech that was tantamount to in-school speech. See n. 1, *supra.* And in those cases, the Court appeared to take it for granted that "the special characteristics of the school environment" justified special rules. *Morse* v. *Frederick*, 551 U. S. 393, 397, 403, 405, 406, n. 2, 408 (2007) (internal quotation marks omitted); *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 266 (1988) (internal quotation marks omitted); *Tinker*, 393 U. S., at 506.

Why the Court took this for granted is not hard to imagine. As a practical matter, it is impossible to see how a school could function if administrators and teachers could not regulate on-premises student speech, including by imposing content-based restrictions in the classroom. In a math class, for example, the teacher can insist that students talk about math, not some other subject. See *Kuhlmeier*, 484 U. S., at 279 (Brennan, J., dissenting) ("The young polemic who stands on a soapbox during calculus class to deliver an eloquent political diatribe interferes with the legitimate teaching of calculus"). In addition, when a teacher asks a question, the teacher must have the authority to insist that the student respond to that question and not some other question, and a teacher must also have the authority to speak without interruption and to demand that students refrain from interrupting one another. Practical necessity likewise dictates that teachers and school administrators have related authority with respect to other in-school activities like auditorium programs attended by a large audience. See *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 685 (1986) ("A high school assembly . . . is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students"); *id.,* at 689 (Brennan, J., concurring in judgment) ("In the present case, school officials sought only to ensure that a high school assembly proceed in an orderly manner"); see also *Kuhlmeier*,

484 U. S., at 279 (Brennan, J., dissenting) ("[T]he student who delivers a lewd endorsement of a student-government candidate might so extremely distract an impressionable high school audience as to interfere with the orderly operation of the school").

Because no school could operate effectively if teachers and administrators lacked the authority to regulate in-school speech in these ways, the Court may have felt no need to specify the source of this authority or to explain how the special rules applicable to in-school student speech fit into our broader framework of free-speech case law. But when a public school regulates what students say or write when they are not on school grounds and are not participating in a school program, the school has the obligation to answer the question with which I began: Why should enrollment in a public school result in the diminution of a student's free-speech rights?

The only plausible answer that comes readily to mind is consent, either express or implied. The theory must be that by enrolling a child in a public school, parents consent on behalf of the child to the relinquishment of some of the child's free-speech rights.

This understanding is consistent with the conditions to which an adult would implicitly consent by enrolling in an adult education class run by a unit of state or local government. If an adult signs up for, say, a French class, the adult may be required to speak French, to answer the teacher's questions, and to comply with other rules that are imposed for the sake of orderly instruction.

When it comes to children, courts in this country have analyzed the issue of consent by adapting the common-law doctrine of *in loco parentis*. See *Morse*, 551 U. S., at 413–416 (THOMAS, J., concurring). Under the common law, as Blackstone explained, "[a father could] delegate part of his parental authority . . . to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has *such a portion*

*of the power of the parent* committed to his charge, [namely,] that of restraint and correction, *as may be necessary to answer the purposes for which he is employed.*"  1 W. Blackstone, Commentaries on the Laws of England 441 (1765) (some emphasis added).

Blackstone's explanation of the doctrine seems to treat it primarily as an implied term in a private employment agreement between a father and those with whom he contracted for the provision of educational services for his child,[9] and therefore the scope of the delegation that could be inferred depended on "the purposes for which [the tutor or schoolmaster was] employed." *Ibid.*  If a child was sent to a boarding school, the parents would not have been in a position to monitor or control the child's behavior or to attend to the child's welfare on a daily basis, and the schoolmaster would be regarded as having implicitly received the authority to perform those functions around the clock while the child was in residence.  On the other hand, if parents hired a tutor to instruct a child in the home on certain subjects during certain hours, the scope of the delegation would be different.  The tutor would be in charge during lessons, but the parents would retain most of their authority.  In short, the scope of the delegation depended on the scope of the agreed-upon undertaking.

Today, of course, the educational picture is quite different.  The education of children within a specified age range is compulsory,[10] and States specify the minimum number of

_____

[9] In a sensational and highly publicized mid-19th century case, there was an express delegation, *Regina* v. *Hopley*, 2 F. & F. 202, 175 Eng. Rep. 1024 (N. P. 1860), but in other 19th century cases, the delegation was inferred.  See *Fitzgerald* v. *Northcote*, 4 F. & F. 656, 176 Eng. Rep. 734 (N. P. 1865); *State* v. *Osborne*, 24 Mo. App. 309 (1887).

[10] See *Ingraham* v. *Wright*, 430 U. S. 651, 660, n. 14 (1977) (noting that "compulsory school attendance laws were in force in all the States" by 1918).

hours per day and the minimum number of days per year that a student must attend classes, as well as many aspects of the school curriculum.[11]  Parents are not required to enroll their children in a public school.  They can select a private school if a suitable one is available and they can afford the tuition, and they may also be able to educate their children at home if they have the time and ability and can meet the standards that their State imposes.[12]  But by choice or necessity, nearly 90% of the students in this country attend public schools,[13] and parents and public schools do not enter into a contractual relationship.

   If *in loco parentis* is transplanted from Blackstone's England to the 21st century United States, what it amounts to is simply a doctrine of inferred parental consent to a public

————————

[11] See National Center for Education Statistics (NCES), State Education Practices, Table 5.14: Number of Instructional Days and Hours in the School Year, by State, 2018, https://nces.ed.gov/programs/ statereform/tab5_14.asp.

[12] Pennsylvania, for example, requires a minimum of 180 days of instruction per year.  See Pa. Stat. Ann., Tit. 24, §13–1327.1(c) (Purdon 2016).  Students must be taught English, mathematics, science, geography, history, civics, safety education, health, physical education, music, and art. §§13–1327.1(c)(1)–(2).  Parents are required to maintain current and detailed records of their child's learning materials and progress, §13–1327.1(e)(1), and they must turn those records over to a teacher or psychologist for an annual evaluation to determine whether "an appropriate education is occurring," §13–1327.1(e)(2).  The evaluation also includes an interview of the child.  *Ibid.*  Once the evaluation is completed, it is submitted to the superintendent of the public school district of residence.  §§13–1327.1(e)(2), (h)(1).  If the superintendent and a hearing examiner find that the child is not being supplied an appropriate education, and the parents' appeal of that decision is unsuccessful, the child will be promptly enrolled in the public school district of residence or a private school. §§13–1327.1(k)–(*l*).

[13] See NCES, School Choice in the United States, 2019, Table 206.20: Percentage Distribution of Students Ages 5 through 17 Attending Kindergarten through 12th Grade, By School Type or Participation in Homeschooling and Selected Child, Parent, and Household Characteristics, Selected Years 1999 Through 2016, https://nces.ed.gov/programs/ digest//d19/tables/dt19_206.20.asp.

school's exercise of a degree of authority that is commensurate with the task that the parents ask the school to perform. Because public school students attend school for only part of the day and continue to live at home, the degree of authority conferred is obviously less than that delegated to the head of a late-18th century boarding school, but because public school students are taught outside the home, the authority conferred may be greater in at least some respects than that enjoyed by a tutor of Blackstone's time.

So how much authority to regulate speech do parents implicitly delegate when they enroll a child at a public school? The answer must be that parents are treated as having relinquished the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission, as well as the authority to perform any other functions to which parents expressly or implicitly agree—for example, by giving permission for a child to participate in an extracurricular activity or to go on a school trip.

### III

I have already explained what this delegated authority means with respect to student speech during standard classroom instruction. And it is reasonable to infer that this authority extends to periods when students are in school but are not in class, for example, when they are walking in a hall, eating lunch, congregating outside before the school day starts, or waiting for a bus after school. During the entire school day, a school must have the authority to protect everyone on its premises, and therefore schools must be able to prohibit threatening and harassing speech. An effective instructional atmosphere could not be maintained in a school, and good teachers would be hard to recruit and retain, if students were free to abuse or disrespect them. And the school has a duty to protect students while in school because their parents are unable to do that during

those hours. See *Morse*, 551 U. S., at 424 (ALITO, J., concurring). But even when students are on school premises during regular school hours, they are not stripped of their free-speech rights. *Tinker* teaches that expression that does not interfere with a class (such as by straying from the topic, interrupting the teacher or other students, etc.) cannot be suppressed unless it "involves substantial disorder or invasion of the rights of others." 393 U. S., at 513.

## IV
### A

A public school's regulation of off-premises student speech is a different matter. While the decision to enroll a student in a public school may be regarded as conferring the authority to regulate *some* off-premises speech (a subject I address below), enrollment cannot be treated as a complete transfer of parental authority over a student's speech. In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children. See *Wisconsin* v. *Yoder*, 406 U. S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925) (discussing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). Parents do not implicitly relinquish all that authority when they send their children to a public school. As the Court notes, it would be far-fetched to suggest that enrollment implicitly confers the right to regulate what a child

says or writes at all times of day and throughout the calendar year. See *ante,* at 7.[14] Any such argument would run headlong into the fundamental principle that a State "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit."[15] *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. 205, 214 (2013) (internal quotation marks omitted). While the in-school restrictions discussed above are essential to the operation of a public school system, any argument in favor of expansive regulation of off-premises speech must contend with this fundamental free-speech principle.

---

[14] There is no basis for concluding that the original public meaning of the free-speech right protected by the First and Fourteenth Amendments was understood by Congress or the legislatures that ratified those Amendments as permitting a public school to punish a wide swath of off-premises student speech. Compare *post,* at 2–4 (THOMAS, J., dissenting). At the time of the adoption of the First Amendment, public education was virtually unknown, and the Amendment did not apply to the States. And as for the Fourteenth Amendment, research has found only one pre-1868 case involving a public school's regulation of a student's off-premises speech. In *Lander* v. *Seaver*, 32 Vt. 114 (1859), an 11-year-old boy, while driving his father's cow by the home of his teacher, called the teacher "Old Jack Seaver" in the presence of other students. *Id.,* at 115 (emphasis deleted). The next day, the teacher "whipped him with a small rawhide." *Ibid.* In a tort suit against the teacher for assault and battery, the Supreme Court of Vermont reversed the lower court's judgment for the teacher but opined that the teacher had the authority to punish the student's speech because of its effect on the operation of the school. *Id.,* at 120–121, 125. This decision is of negligible value for present purposes. It does not appear that any claim was raised under the state constitutional provision protecting freedom of speech. And even if flinty Vermont parents at the time in question could be understood to have implicitly delegated to the teacher the authority to whip their son for his off-premises speech, the same inference is wholly unrealistic today.

[15] Here, the Pennsylvania Constitution required that B. L. and all other students be offered "a thorough and efficient system of public education." Art. III, §14.

## B

The degree to which enrollment in a public school can be regarded as a delegation of authority over off-campus speech depends on the nature of the speech and the circumstances under which it occurs. I will not attempt to provide a complete taxonomy of off-premises speech, but relevant lower court cases tend to fall into a few basic groups. And with respect to speech in each of these groups, the question that courts must ask is whether parents who enroll their children in a public school can reasonably be understood to have delegated to the school the authority to regulate the speech in question.

One category of off-premises student speech falls easily within the scope of the authority that parents implicitly or explicitly provide. This category includes speech that takes place during or as part of what amounts to a temporal or spatial extension of the regular school program, *e.g.,* online instruction at home, assigned essays or other homework, and transportation to and from school. Also included are statements made during other school activities in which students participate with their parents' consent, such as school trips, school sports and other extracurricular activities that may take place after regular school hours or off school premises, and after-school programs for students who would otherwise be without adult supervision during that time. Abusive speech that occurs while students are walking to and from school may also fall into this category on the theory that it is school attendance that puts students on that route and in the company of the fellow students who engage in the abuse. The imperatives that justify the regulation of student speech while in school—the need for orderly and effective instruction and student protection—apply more or less equally to these off-premises activities.

Most of the specific examples of off-premises speech that the Court mentions fall into this category. See *ante,* at 6

(speech taking place during "remote learning," "participation in other online school activities," "activities taken for school credit," "travel en route to and from the school," "[the time during which] the school is responsible for the student," and "extracurricular activities," as well as speech taking place on "the school's immediate surroundings" or in the context of "writing . . . papers").[16]  The Court's broad statements about off-premises speech must be understood with this in mind.

At the other end of the spectrum, there is a category of speech that is almost always beyond the regulatory authority of a public school.  This is student speech that is not expressly and specifically directed at the school, school administrators, teachers, or fellow students and that addresses matters of public concern, including sensitive subjects like politics, religion, and social relations.  Speech on such matters lies at the heart of the First Amendment's protection,

---

[16] Two other examples mentioned by the Court—"communications to school e-mail accounts or phones" and speech "on a school's website"— may fall into the same category if they concern school work.  *Ante,* at 6. The Court also mentions "breaches of school security devices," *ibid.*, but such breaches may be punishable regardless of whether the perpetrator is a student at the school.  See, *e.g.,* 18 Pa. Const. Stat. §7611 (2016) ("Unlawful use of computer and other computer crimes").  Another specific example provided by the Court is "all speech taking place over school laptops."  *Ante,* at 6.  I do not take this statement to apply under all circumstances to all student speech on such laptops.  In a well-publicized case, a public high school that provided laptops to high school students used those computers to surreptitiously monitor students' private messages and to photograph them in their homes.  See *Robbins* v. *Lower Merion School Dist.*, 2010 WL 3421026, \*1 (ED Pa., Aug. 30, 2010); see also Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and in Support of Defendants' Cross-Motion for Entry of Permanent Equitable Relief in *Robbins* v. *Lower Merion School Dist.*, No. 2:10–cv–00665 (ED Pa.), pp. 4–5.  I do not understand the Court to approve such a practice.  In assessing the degree to which a school can regulate speech on a laptop that a school provides for student use outside school, it would be important to know the terms of the agreement under which the laptop was provided.

see *Lane* v. *Franks*, 573 U. S. 228, 235 (2014) ("Speech by citizens on matters of public concern lies at the heart of the First Amendment"); *Schenck* v. *Pro-Choice Network of Western N. Y.*, 519 U. S. 357, 377 (1997) ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment"); *Capital Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 760 (1995) ("[A] free-speech clause without religion would be Hamlet without the prince"); *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 347 (1995) ("[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression"); *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 50 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern"); *Connick* v. *Myers*, 461 U. S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection" (internal quotation marks omitted)), and the connection between student speech in this category and the ability of a public school to carry out its instructional program is tenuous.

If a school tried to regulate such speech, the most that it could claim is that offensive off-premises speech on important matters may cause controversy and recriminations among students and may thus disrupt instruction and good order on school premises. But it is a "bedrock principle" that speech may not be suppressed simply because it expresses ideas that are "offensive or disagreeable." *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989); see also *Matal* v. *Tam*, 582 U. S. \_\_\_, \_\_\_–\_\_\_ (2017) (slip op., at 1–2) ("Speech may not be banned on the ground that it expresses ideas that offend"); *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 745 (1978) (opinion of Stevens, J.) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it"); *Young* v. *American Mini Theatres, Inc.*, 427 U. S.

50, 63–64 (1976) (plurality opinion) ("Nor may speech be curtailed because it invites dispute, creates dissatisfaction with conditions the way they are, or even stirs people to anger"); *Street* v. *New York*, 394 U. S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"). It is unreasonable to infer that parents who send a child to a public school thereby authorize the school to take away such a critical right.

To her credit, petitioner's attorney acknowledged this during oral argument. As she explained, even if such speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out; "that would be a heckler's veto." Tr. of Oral Arg. 15–16.[17] The school may suppress the disruption, but it may not punish the off-campus speech that prompted other students to engage in misconduct. See *id.,* at 5–6 ("[I]f listeners riot because they find speech offensive, schools should punish the rioters, not the speaker. In other words, the hecklers don't get the veto"); see also *id.,* at 27–28.

This is true even if the student's off-premises speech on a matter of public concern is intemperate and crude. When a student engages in oral or written communication of this nature, the student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protection against government regulation as all other members of the public. And the Court has

---

[17] Counsel was asked what a school could have done during the Vietnam War era if a student said, "[the] war is immoral, American soldiers are baby killers, I hope there are a lot of casualties so that people will rise up." Tr. of Oral Arg. 15. Counsel agreed that "[e]ven if that would cause a disruption in the school," "the school couldn't do anything about it." *Ibid.* In her words, "that would be a heckler's veto, no can do." *Id.,* at 15–16.

held that these rights extend to speech that is couched in vulgar and offensive terms. See, *e.g.*, *Iancu* v. *Brunetti*, 588 U. S. \_\_\_ (2019); *Matal*, 582 U. S. \_\_\_; *Snyder* v. *Phelps*, 562 U. S. 443 (2011); *Cohen* v. *California*, 403 U. S. 15 (1971); *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969) (*per curiam*).

Between these two extremes (*i.e.*, off-premises speech that is tantamount to on-campus speech and general statements made off premises on matters of public concern) lie the categories of off-premises student speech that appear to have given rise to the most litigation. A survey of lower court cases reveals several prominent categories. I will mention some of those categories, but like the Court, I do not attempt to set out the test to be used in judging the constitutionality of a public school's efforts to regulate such speech.

One group of cases involves perceived threats to school administrators, teachers, other staff members, or students. Laws that apply to everyone prohibit defined categories of threats,[18] see, *e.g.*, 18 Pa. Cons. Stat. §2706(a);[19] Tex. Penal Code Ann. §22.07(a) (West 2020),[20] but schools have

––––––––––

[18] The First Amendment permits prohibitions of "true threats," which are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia* v. *Black*, 538 U. S. 343, 359 (2003).

[19] This law is commonly referred to as Pennsylvania's "terrorist threat statute." It prohibits "communicat[ing], either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another; (2) cause evacuation of a building, place of assembly or facility of public transportation; or (3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience."

[20] In Texas, it is a crime to "threate[n] to commit any offense involving violence to any person or property" with specified intent, such as the intent to "place another person in fear of imminent serious bodily injury" or to "interrupt the occupation or use of a . . . public place."

claimed that their duties demand broader authority.[21]

Another common category involves speech that criticizes or derides school administrators, teachers, or other staff members.[22] Schools may assert that parents who send their children to a public school implicitly authorize the school to demand that the child exhibit the respect that is required for orderly and effective instruction, but parents surely do not relinquish their children's ability to complain in an appropriate manner about wrongdoing, dereliction, or even plain incompetence. See Brief for College Athlete Advocates as *Amicus Curiae* 12–21; Brief for Student Press Law Center et al. as *Amici Curiae* 10–11, 17–20, 30.

Perhaps the most difficult category involves criticism or

––––––––––

[21] See, *e.g., McNeil* v. *Sherwood School Dist. 88J*, 918 F. 3d 700, 704 (CA9 2019) (*per curiam*) (student created a "hit list" of students and drew graphic images of violence); *Wynar* v. *Douglas County School Dist.*, 728 F. 3d 1062, 1065–1066 (CA9 2013) (student spoke about committing a school shooting); *Wisniewski* v. *Board of Ed.*, 494 F. 3d 34, 36 (CA2 2007) (student sent a message depicting a pistol firing a bullet at his English teacher's head); *Porter* v. *Ascension Parish School Bd.*, 393 F. 3d 608, 611 (CA5 2004) (student drew a picture showing his school under attack by a gasoline tanker, missile launcher, helicopter, and armed individuals); *Doe* v. *Pulaski County Special School Dist.*, 306 F. 3d 616, 619 (CA8 2002) (en banc) (student drafted letters expressing a desire to molest, rape, and murder his ex-girlfriend); but see *Conroy* v. *Lacey Twp. School Dist.*, 2020 WL 528896, \*1 (D NJ, Jan. 31, 2020) (two high school students posted photos on Snapchat showing them with legally purchased guns at a shooting range on a Saturday, which another student claimed made him "'nervous to come to school'"); see also *Conroy* v. *Lacey Twp. School Dist.*, No. 3:19–cv–09452 (D NJ, Aug. 25, 2020) (order dismissing case with prejudice after settlement). The cases cited in this footnote and footnotes 22–23 are listed to show types of claims addressed by the lower courts. I do not express any view about the correctness of the decisions.

[22] See, *e.g.*, *Doninger* v. *Niehoff*, 527 F. 3d 41, 45 (CA2 2008) (member of student council posted a message on her personal blog complaining about the administration and encouraging readers to call or e-mail the school to complain); *Evans* v. *Bayer*, 684 F. Supp. 2d 1365, 1367 (SD Fla. 2010) (student created a Facebook group "for students to voice their dislike" of their teacher).

hurtful remarks about other students.[23]　Bullying and severe harassment are serious (and age-old) problems, but these concepts are not easy to define with the precision required for a regulation of speech.　See, *e.g.*, *Saxe* v. *State College Area School Dist.*, 240 F. 3d 200, 206–207 (CA3 2001).

V

The present case does not fall into any of these categories. Instead, it simply involves criticism (albeit in a crude manner) of the school and an extracurricular activity.　Unflattering speech about a school or one of its programs is different from speech that criticizes or derides particular individuals, and for the reasons detailed by the Court and by Judge Ambro in his separate opinion below, the school's justifications for punishing B. L.'s speech were weak.　She sent the messages and image in question on her own time while at a local convenience store.　They were transmitted via a medium that preserved the communication for only 24 hours, and she sent them to a select group of "friends."　She did not send the messages to the school or to any administrator, teacher, or coach, and no member of the school staff would have even known about the messages if some of B. L.'s "friends" had not taken it upon themselves to spread the word.

The school did not claim that the messages caused any significant disruption of classes.　The most it asserted along

---

　　[23] See, *e.g.*, *S. J. W.* v. *Lee's Summit R–7 School Dist.*, 696 F. 3d 771, 773–774 (CA8 2012) (high school juniors posted a variety of offensive, racist, and sexually-explicit comments about particular female classmates); *Kowalski* v. *Berkeley County Schools*, 652 F. 3d 565, 567–568 (CA4 2011) (student created an online discussion group accusing another student of having a sexually-transmitted disease); *Dunkley* v. *Board of Ed. of Greater Egg Harbor Regional High School Dist.*, 216 F. Supp. 3d 485, 487 (NJ 2016) (student used an anonymous Twitter account to insult other students based on their appearances and athletic abilities).

these lines was that they "upset" some students (including members of the cheerleading squad),[24] caused students to ask some questions about the matter during an algebra class taught by a cheerleading coach,[25] and put out "negativity . . . that could impact students in the school."[26] The freedom of students to speak off-campus would not be worth much if it gave way in the face of such relatively minor complaints. Speech cannot be suppressed just because it expresses thoughts or sentiments that others find upsetting, and the algebra teacher had the authority to quell in-class discussion of B. L.'s messages and demand that the students concentrate on the work of the class.

As for the messages' effect on the morale of the cheerleading squad, the coach of a team sport may wish to take group cohesion and harmony into account in selecting members of the team, in assigning roles, and in allocating playing time, but it is self-evident that this authority has limits. (To take an obvious example, a coach could not discriminate against a student for blowing the whistle on serious misconduct.) And here, the school did not simply take B. L.'s messages into account in deciding whether her attitude would make her effective in doing what cheerleaders are primarily expected to do: encouraging vocal fan support at the events where they appear. Instead, the school imposed punishment: suspension for a year from the cheerleading squad despite B. L.'s apologies.

There is, finally, the matter of B. L.'s language. There are parents who would not have been pleased with B. L.'s language and gesture, but whatever B. L.'s parents thought about what she did, it is not reasonable to infer that they gave the school the authority to regulate her choice of language when she was off school premises and not engaged in

_____
[24] App. 82.
[25] *Id.*, at 82–84.
[26] *Id.,* at 81.

any school activity. And B. L.'s school does not claim that it possesses or makes any effort to exercise the authority to regulate the vocabulary and gestures of all its students 24 hours a day and 365 days a year.

There are more than 90,000 public school principals in this country[27] and more than 13,000 separate school districts.[28] The overwhelming majority of school administrators, teachers, and coaches are men and women who are deeply dedicated to the best interests of their students, but it is predictable that there will be occasions when some will get carried away, as did the school officials in the case at hand. If today's decision teaches any lesson, it must be that the regulation of many types of off-premises student speech raises serious First Amendment concerns, and school officials should proceed cautiously before venturing into this territory.

———————

[27] See NCES, School Principals, Table 212.08: Number and Percentage Distribution in Public and Private Elementary and Secondary Schools, Selected Years 1993–1994 Through 2017–2018, https://nces.ed.gov/programs/digest/d19/tables/dt19_212.08.asp?current=yes.

[28] See NCES, Overview of Schools and School Districts, Table 214.10: Number of Public School Districts and Public and Private Elementary and Secondary Schools, Selected Years 1869–1870 Through 2018–2019, https://nces.ed.gov/programs/digest/d20/tables/dt20_214.10.asp.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–255

———————

## MAHANOY AREA SCHOOL DISTRICT, PETITIONER *v.* B. L., A MINOR, BY AND THROUGH HER FATHER, LAWRENCE LEVY AND HER MOTHER, BETTY LOU LEVY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 23, 2021]

JUSTICE THOMAS, dissenting.

B. L., a high school student, sent a profanity-laced message to hundreds of people, including classmates and teammates. The message included a picture of B. L. raising her middle finger and captioned "F*** school" and "f*** cheer." This message was juxtaposed with another, which explained that B. L. was frustrated that she failed to make the varsity cheerleading squad. The cheerleading coach responded by disciplining B. L.

The Court overrides that decision—without even mentioning the 150 years of history supporting the coach. Using broad brushstrokes, the majority outlines the scope of school authority. When students are on campus, the majority says, schools have authority *in loco parentis*—that is, as substitutes of parents—to discipline speech and conduct. Off campus, the authority of schools is somewhat less. At that level of generality, I agree. But the majority omits important detail. What authority does a school have when it operates *in loco parentis*? How much less authority do schools have over off-campus speech and conduct? And how does a court decide if speech is on or off campus?

Disregarding these important issues, the majority simply posits three vague considerations and reaches an outcome.

A more searching review reveals that schools historically could discipline students in circumstances like those presented here. Because the majority does not attempt to explain why we should not apply this historical rule and does not attempt to tether its approach to anything stable, I respectfully dissent.

I

A

While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to "what 'ordinary citizens' at the time of [the Fourteenth Amendment's] ratification would have understood" the right to encompass. *McDonald* v. *Chicago*, 561 U. S. 742, 813 (2010) (THOMAS, J., concurring in part and concurring in judgment). Cases and treatises from that era reveal that public schools retained substantial authority to discipline students. As I have previously explained, that authority was near plenary while students were at school. See *Morse* v. *Frederick*, 551 U. S. 393, 419 (2007) (concurring opinion). Authority also extended to when students were traveling to or from school. See, *e.g., Lander* v. *Seaver*, 32 Vt. 114, 120 (1859). And, although schools had less authority after a student returned home, it was well settled that they still could discipline students for off-campus speech or conduct that had a proximate tendency to harm the school environment.

Perhaps the most familiar example applying this rule is a case where a student, after returning home from school, used "disrespectful language" against a teacher—he called the teacher "old"—"in presence of the [teacher] and of some of his fellow pupils." *Id.*, at 115 (emphasis deleted). The Vermont Supreme Court held that the teacher could discipline a student for this speech because the speech had "a

direct and immediate tendency to injure the school, to subvert the master's authority, and to beget disorder and insubordination." *Id.,* at 120; see also *ibid.* ("direct and immediate tendency to . . . bring the master's authority into contempt").  The court distinguished the speech at issue from speech "in no ways connected with or affecting the school" and speech that has "merely a remote and indirect tendency to injure." *Id.,* at 120–121.  In requiring a "direct and immediate tendency" to harm, *id.,* at 120, the court used the language of proximate causation, see Black's Law Dictionary 274 (11th ed. 2019) (defining "proximate cause" as a "cause that directly produces an event"); *id.,* at 1481 (defining "proximate" as "[i]mmediately before or after"); see also *Atchison, T. & S. F. R. Co.* v. *Calhoun*, 213 U. S. 1, 7 (1909) (using "proximate" cause and "immediate" cause interchangeably).

This rule was widespread.  It was consistent with "the universal custom" in New England.  *Lander*, 32 Vt., at 121. Various cases, treatises, and school manuals endorsed it.* And a justice of the Rhode Island Supreme Court, presiding over a trial, declared the rule "well settled."  T. Stockwell, The School Manual, Containing the School Laws of Rhode Island 236–238 (1882) (Stockwell).

So widespread was this rule that it served not only as the basis for schools to discipline disrespectful speech but also to regulate truancy.  Although modern doctrine draws a clear line between speech and conduct, cases in the 19th century did not.  *E.g., Lander*, 32 Vt., at 120 (describing

---

*E.g., Deskins* v. *Gose*, 85 Mo. 485, 488–489 (1885) (citing *Lander*); F. Burke, Law of Public Schools 116, 129 (1880) ("[W]hatsoever has a direct and immediate tendency to injure the school in its important interests, or to subvert the authority of those in charge of it, is properly a subject for regulation and discipline, and this is so *wherever* the acts may be committed" (citing *Lander*)); C. Bardeen, The New York School Office's Handbook 158 (1910) (citing *Lander*).

speech as "acts of misbehavior"); Stockwell 236–238 (applying the *Lander* rule to "[t]he conduct of pupils"); *Morse*, 551 U. S., at 419 (THOMAS, J., concurring) ("speech rules and other school rules were treated identically"). Citing *Lander*, schools justified regulating truancy because of its proximate tendency to harm schools. As the Missouri Supreme Court put it, although "[t]ruancy is an act committed out of the school," schools could regulate it because of its "subversive" effects on the "good order and discipline of the school." *Deskins* v. *Gose*, 85 Mo. 485, 488–489 (1885); see also *Burdick* v. *Babcock*, 31 Iowa 562, 565, 567 (1871) ("If the effects of acts done out of school-hours reach within the schoolroom during school hours and are detrimental to good order and the best interest of the pupils, it is evident that such acts may be forbidden").

Some courts made statements that, if read in isolation, could suggest that schools had no authority at all to regulate off-campus speech. *E.g., Dritt* v. *Snodgrass*, 66 Mo. 286, 297 (1877) (Norton, J., joined by a majority of the court, concurring) ("neither the teacher nor directors have the authority to follow [a student home], and govern his conduct while under the parental eye" because that would "supersede entirely parental authority"). But, these courts made it clear that the rule against regulating off-campus speech applied only when that speech was "nowise connected with the management or successful operation of the school." *King* v. *Jefferson City School Bd.*, 71 Mo. 628, 630 (1880) (distinguishing *Dritt*); accord, *Lander*, 32 Vt., at 120–121 (similar). In other words, they followed *Lander*: A school can regulate speech when it occurs off campus, so long as it has a proximate tendency to harm the school, its faculty or students, or its programs.

### B

If there is a good constitutional reason to depart from this historical rule, the majority and the parties fail to identify

it. I would thus apply the rule. Assuming that B. L.'s speech occurred off campus, the purpose and effect of B. L.'s speech was "to degrade the [program and cheerleading staff]" in front of "other pupils," thus having "a direct and immediate tendency to . . . subvert the [cheerleading coach's] authority." *Id.,* at 115, 120. As a result, the coach had authority to discipline B. L.

Our modern doctrine is not to the contrary. "[T]he penalties imposed in this case were unrelated to any political viewpoint" or religious viewpoint. *Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675, 685 (1986). And although the majority sugar coats this speech as "criticism," *ante,* at 8, it is well settled that schools can punish "vulgar" speech—at least when it occurs on campus, *e.g., Fraser,* 478 U. S., at 683–684; *ante,* at 5.

The discipline here—a 1-year suspension from the team—may strike some as disproportionate. Tr. of Oral Arg. 31, 57. But that does not matter for our purposes. State courts have policed school disciplinary decisions for "reasonable[ness]." *E.g., Burdick,* 31 Iowa, at 565. And disproportionate discipline "can be challenged by parents in the political process." *Morse,* 551 U. S., at 420 (THOMAS, J., concurring). But the majority and the parties provide no textual or historical evidence to suggest that federal courts generally can police the proportionality of school disciplinary decisions in the name of the First Amendment.

## II

The majority declines to consider any of this history, instead favoring a few pragmatic guideposts. This is not the first time the Court has chosen intuition over history when it comes to student speech. The larger problem facing us today is that our student-speech cases are untethered from any textual or historical foundation. That failure leads the majority to miss much of the analysis relevant to these kinds of cases.

A

Consider the Court's longtime failure to grapple with the historical doctrine of *in loco parentis*. As I have previously explained, the Fourteenth Amendment was ratified against the background legal principle that publicly funded schools operated not as ordinary state actors, but as delegated substitutes of parents. *Id.,* at 411–413. This principle freed schools from the constraints the Fourteenth Amendment placed on other government actors. "[N]o one doubted the government's ability to educate and discipline children as private schools did," including "through strict discipline . . . for behavior the school considered disrespectful or wrong." *Id.*, at 411–412. "The doctrine of *in loco parentis* limited the ability of schools to set rules and control their classrooms in almost no way." *Id.*, at 416.

Plausible arguments can be raised in favor of departing from that historical doctrine. When the Fourteenth Amendment was ratified, just three jurisdictions had compulsory-education laws. M. Katz, A History of Compulsory Education Laws 17 (1976). One might argue that the delegation logic of *in loco parentis* applies only when delegation is voluntary. But cf. *id.,* at 11–13 (identifying analogs to compulsory-education laws as early as the 1640s); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925) (requiring States to permit parents to send their children to nonpublic schools). The Court, however, did not make that (or any other) argument against this historical doctrine.

Instead, the Court simply abandoned the foundational rule without mentioning it. See *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969). Rather than wrestle with this history, the Court declared that it "ha[d] been the unmistakable holding of this Court for almost 50 years" that students have free-speech rights inside schools. *Id.,* at 506. "But the cases the Court cited in favor of that bold proposition do not support it." *Morse*, 551 U. S., at 420, n. 8 (THOMAS, J., concurring). The cases on

which *Tinker* chiefly relied concerned the rights of parents and private schools, not students. 551 U. S., at 420, n. 8. Of the 11 cases the Court cited, only one—*West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943)—was on point. But, like *Tinker*, *Barnette* failed to mention the historical doctrine undergirding school authority. Not until decades later did the Court even hint at this doctrine, and, then, only as an aside. See *Fraser*, 478 U. S., at 684.

The majority does no better today. At least it acknowledges that schools act *in loco parentis* when students speak on campus. See, *e.g., ante,* at 5. But the majority fails to address the historical contours of that doctrine, whether the doctrine applies to off-campus speech, or why the Court has abandoned it.

B

The Court's failure to explain itself in *Tinker* needlessly makes this case more difficult. Unlike *Tinker*, which involved a school's authority under a straightforward fact pattern, this case involves speech made in one location but capable of being received in countless others—an issue that has been aggravated exponentially by recent technological advances. The Court's decision not to create a solid foundation in *Tinker*, and now here not to consult the relevant history, predictably causes the majority to ignore relevant analysis.

First, the majority gives little apparent significance to B. L.'s decision to participate in an extracurricular activity. But the historical test suggests that authority of schools over off-campus speech may be greater when students participate in extracurricular programs. The *Lander* test focuses on the *effect* of speech, not its location. So students like B. L. who are active in extracurricular programs have a greater potential, by virtue of their participation, to harm those programs. For example, a profanity-laced screed delivered on social media or at the mall has a much different

effect on a football program when done by a regular student than when done by the captain of the football team. So, too, here.

Second, the majority fails to consider whether schools often will have *more* authority, not less, to discipline students who transmit speech through social media. Because off-campus speech made through social media can be received on campus (and can spread rapidly to countless people), it often will have a greater proximate tendency to harm the school environment than will an off-campus in-person conversation.

Third, and relatedly, the majority uncritically adopts the assumption that B. L.'s speech, in fact, was off campus. But, the location of her speech is a much trickier question than the majority acknowledges. Because speech travels, schools sometimes may be able to treat speech as on campus even though it originates off campus. Nobody doubts, for example, that a school has *in loco parentis* authority over a student (and can discipline him) when he passes out vulgar flyers on campus—even if he creates those flyers off campus. The same may be true in many contexts when social media speech is generated off campus but received on campus. To be sure, this logic might not apply where the on-campus presence of speech is not proximately connected to its off-campus origin—as when a student "wholly accidental[ly]" brings a sibling's sketch to school years after it is created. *Porter* v. *Ascension Parish School Bd.*, 393 F. 3d 608, 615, 617–618 (CA5 2004). This break in proximate causation might occur more often when a school prohibits the use of personal devices or social media on campus. See Tr. of Oral Arg. 68–69. But where it is foreseeable and likely that speech will travel onto campus, a school has a stronger claim to treating the speech as on-campus speech.

Here, it makes sense to treat B. L.'s speech as off-campus speech. There is little evidence that B. L.'s speech was received on campus. The cheerleading coach, in fact, did not

view B. L.'s speech. She viewed a *copy* of that speech (a screenshot) created by another student. *Ante*, at 2. But, the majority mentions none of this. It simply, and uncritically, assumes that B. L.'s speech was off campus. Because it creates a test untethered from history, it bypasses this relevant inquiry.

\*     \*     \*

The Court transparently takes a common-law approach to today's decision. In effect, it states just one rule: Schools can regulate speech less often when that speech occurs off campus. It then identifies this case as an "example" and "leav[es] for future cases" the job of developing this new common-law doctrine. *Ante*, at 7–8. But the Court's foundation is untethered from anything stable, and courts (and schools) will almost certainly be at a loss as to what exactly the Court's opinion today means.

Perhaps there are good constitutional reasons to depart from the historical rule, and perhaps this Court and lower courts will identify and explain these reasons in the future. But because the Court does not do so today, and because it reaches the wrong result under the appropriate historical test, I respectfully dissent.